Mario **PICHLER** et al., Plaintiffs,

v.

W. Pat **JENNINGS**, As Clerk of the United States House of Representatives, et al., Defendants.

No. 72 Civ. 548.

United States District Court, S. D. New York.

Sept. 12, 1972.

Alfred Avins, New York City, for plaintiffs.

Whitney North Seymour, Jr., U. S. Atty., S.D.N.Y. by Frank H. Wohl, Asst. U. S. Atty., for defendants.

## OPINION

POLLACK, District Judge.

Contending that the complaint fails to present a case or controversy and fails to state a claim upon which relief may be granted, the defendants, the Clerk of the United States House of Representatives and the Comptroller General of the United States, have moved pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss this suit.

Plaintiffs are state or district officers of the Conservative Party in New York State and seek declaratory and injunctive relief in respect of the Federal Election Campaign Act of 1971 (the "Act" hereafter). They challenge the constitutionality of provisions which in effect serve to place a ceiling on the amounts which candidates may spend on communications media for election campaigns and which serve to police those allowable limits and other provisions which require political committees to register and make disclosure of the sources of contributed funds and of the identity of the persons administering and receiving such funds.

The declared purpose of the Act was to

Establish reasonable and adequate limitations on the amount of money that may be spent for use of the broadcast media and nonbroadcast media by or on behalf of legally qualified candidates for the offices of President, Vice-President, United States Senator or Representative, Delegate or Resident Commissioner to the Congress (Federal elective office) in primary, general and special elections.[1]

The Act prescribes the limit which may be spent for use of communications media by or on behalf of a candidate's campaign. The spending limit is ten cents per voter in the relevant geographical area or $50,000., whichever is greater. 47 U.S.C. §§ 801–805; Title I, Federal Election Campaign Act of 1971. The candidate is required to file an account of his receipts and expenditures. 2 U.S.C. § 431–441; Title III idem. The prior law, the Corrupt Practices Act of 1925, likewise required an account of moneys spent on an election. 2 U.S.C.

---

1. S.Rep. 92–93, 92d Cong., 1st Sess. 21.

§§ 241, et seq. However, the earlier law did not necessarily yield a satisfactory account of the sources of funds, of all expenditures made on behalf of a candidate nor of the recipients thereof. For example, there were multiple lower echelon committees whose financial activities were unknown to and therefore unreported by the candidate's account. In part to close the loop-holes, the 1971 Act, Title I, deals specifically with communications media expenditures and places on media whose facilities are sought on *behalf* of a candidate, the obligation to inform the candidate of the cost to be incurred and the obligation to obtain from the candidate or his representative a certificate that the expenditure would not cause the candidate to exceed his spending limit. Sanctions are imposed for failure to observe these requirements against candidates who exceed their limits and against media organizations which accept payment for campaign advertising not certified as required by the Act.

Plaintiffs contend that the statute unconstitutionally restricts freedom of expression. They assert that the certification requirement hands a "veto" power to major-party candidates, who, by refusing the certificate can prevent plaintiffs and clubs and organizations they represent from propagandizing their views if those views do not meet the candidate's approval, as when the expression is critical of the candidate. Thus, say the plaintiffs, third-party discussion of major-party candidates is restricted to conform to the candidate's own thinking. Plaintiffs candidly state that they do espouse unpopular ideas.

Another section of the Act, Title III, is challenged as improperly infringing freedom of association. This section requires disclosure of the sources and disposition of contributions as well as of the identification of those handling and receiving the funds. Reluctance on the part of some to be publicly identified on behalf of a particular candidate or campaign will serve, they say, as a deterrent to some from serving as officers of plaintiffs' clubs and as a deterrent to others from contributing money to plaintiffs for use by the Conservative Party and the clubs of which they are officers. They say further that the requirement to report all persons on the payroll of plaintiffs and their clubs for amounts in excess of $100, although otherwise employed, may deter part-time party workers from taking temporary positions for fear of political reprisal in seeking other employment thereafter.

█ Analysis of the theses of the plaintiffs convinces the Court that the contentions are speculative, plainly lacking in merit as a result, and fail to raise a substantial question of constitutionality of the Act, as more fully appears hereafter.

*Title I. The Statutory and Regulatory Scheme in Question*

Congress passed Title I of the Act to deal with the impression that "only the rich man can run for public office, and that a candidate can buy an election by spending large amounts of money in a campaign." H.R.Rep. 92–564, 92d Cong., 1st Sess. 4.

Plaintiffs do not question the overall limitations imposed on broadcast and non-broadcast media expenditures by a candidate. Their attack is on what media may deem to be a prospective expenditure "on behalf of the candidacy".

The Act does not prohibit media organizations from providing free time or space for campaigning.

Pursuant to a grant of authority conferred by § 105 of Title I, 47 U.S.C. § 804, the Comptroller promulgated regulations now contained in Title II of the Code of Federal Regulations, published March 24, 1972 and effective April 7, 1972. 37 Fed.Reg. 6156. The meaning of "on behalf of" as it appears in § 104(b) of Title I is expressed in § 4.4 of the regulations as follows:

A use of communications media is deemed to be "on behalf of the candidacy" of any such candidate if the use (1) involves his participation by voice or image or advocates his candi-

dacy; or (2) identifies the candidate, directly or by implication, or advocates his candidacy.

The regulations also contain provisions governing attribution of expenditures in opposition to a candidate. 37 Fed.Reg. 6158, §§ 4.4, 4.5.

*Title I: The Ripeness Issue*

Plaintiffs predict the situation in which a candidate refuses to certify for publication or broadcast critical views held by plaintiffs and they claim this would leave them with a sort of Hob-'son's choice: they would be compelled either not to publish or broadcast their critical views or to publish or broadcast and thereby risk prosecution under the penalty provisions of the Act. This dilemma is said to constitute a case or controversy. In any event plaintiffs assert that this matter should be left to a three-judge Court.

Defendants contend, on the other hand, that the issue of whether § 104(b) of Title I contains an unconstitutional veto power is not ripe for adjudication, that a single Judge is competent to so decide and that there is thus no need to refer this to a three-judge Court.

■■ Requisite to the convening of a three-judge Court is a finding of jurisdiction by a single judge. American Commuters Ass'n v. Levitt, 405 F.2d 1148 (2d Cir. 1969). Questions of ripeness and standing imply jurisdictional issues and it is thus necessary that these questions be reviewed initially by the single judge, rather than by reference to a three-judge Court. Abele v. Markle, 452 F.2d 1121, 1124 (2d Cir. 1971) (Standing); American Commuters Ass'n. v. Levitt, 279 F.Supp. 40, 46 (S. D.N.Y.1967), aff'd 405 F.2d 1148 (2d Cir. 1969) (Ripeness); Sellers v. Regents of the U. of Calif., 432 F.2d 493 (9th Cir. 1970); Lion Mfg. Corp. v. Kennedy, 117 U.S.App.D.C. 367, 330 F. 2d 833 (1964) (Ripeness).

Looking to the merits of the ripeness issue, defendants contend the suit is premature. Plaintiffs do not allege that they have offered to purchase a political advertisement in the media and that the offer has been refused by a person who would charge for the service or that they have been denied a certificate by a federal candidate. From these omissions, defendants conclude that plaintiffs have no present cause.

The defendants rely principally on two Supreme Court cases, Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed. 2d 113 (1968) and United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1946). In *Zwickler*, the Court noted that judicial power is constitutionally limited to determining "live controversies" but that there are no precise standards with which to determine whether a given controversy has quickened:

"[T]he federal courts established pursuant to Article III of the Constitution do not render advisory opinions. For adjudication of constitutional issues 'concrete legal issues, presented in actual cases, not abstractions' are requisite. This is as true of declaratory judgments as any other field." United Public Workers [of America] v. Mitchell . . . "The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically the question in each case is whether the facts alleged, under all circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941). 394 U.S. at 108, 89 S.Ct. at 659.

In United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1946), certain federal employees challenged constitutionality of the Hatch Act. The Court held that no justiciable case or controversy was presented be-

cause plaintiffs did not allege that they had violated the Act or that they actually were threatened with any disciplinary action. The Court said:

> The power of the courts . . . arises only when the interests of litigants require the use of this judicial authority for their protection against actual interference. A hypothetical threat is not enough. We can only speculate as to the kinds of political activity the appellants desire to engage in or as to the contents of their proposed statements or the circumstances of their proposed statements or the circumstances of their publication. (pp. 89–90, 67 S.Ct. p. 564)

It is true, of course, that the concept of "actual interference" has been considerably expanded in the First Amendment area since the *United Public Workers* case. *See* National Student Association v. Hershey, 134 U.S.App.D.C. 56, 412 F.2d 1103, 1110 (1969). At least two recent lower court cases have held, on facts remarkably similar to those in *United Public Workers,* that governmental employees, challenging administrative regulations forbidding certain forms of speech, sufficiently allege a justiciable case even absent an actual exercise of such speech by the plaintiffs or an administrative proceeding against them for such speech. Muller v. Conlisk, 429 F.2d 901 (7th Cir. 1970); Gray v. City of Toledo, 323 F.Supp. 1281 (N.D.Ohio 1971). Furthermore, in this Circuit, "actual interference" has been held to include the *threat* of interference as well as the fact, at least where that threat as to the plaintiff is more than an idle one. Wolff v. Selective Service, 372 F.2d 817 (2d Cir. 1967).

In *Wolff,* the Court held justiciable a challenge to local board action in reclassifying plaintiffs from II–S to I–A, thus subjecting each of them to a possible future induction order, where the board action came on the heels of plaintiffs' participation in an anti-war demonstration near Selective Service facilities. The Court stated:

Where basic constitutional rights are imperiled, the courts have not required a series of injured parties to litigate the permissible scope of the statute or administrative interpretation but have nullified the unconstitutional action and required the Government to start in the first instance with a statute or interpretation that will not so overhang free expression that the legitimate exercise of constitutionally protected rights is suppressed. 372 F.2d at 824–825.

In fact very recently, the Supreme Court itself indicated that a threat of specific harm could create a case or controversy, Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972); however, the Court made it clear that "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm." pp. 13–14, 92 S.Ct. p. 2326.

In *Laird* the Court held that the mere existence of the Army's investigative and data gathering activity did not create a justiciable controversy between defendants and certain protest groups and individual citizens. The rule that the Court announced, if not its application, approved other holdings that "the mere existence of a statute, regulation, or articulated policy is *ordinarily* not enough to sustain a judicial challenge, even by one who reasonably believes that the law applies to him and will be enforced against him according to its terms." National Student Association v. Hershey, 134 U.S.App.D.C. 56, 412 F.2d 1103, 1110 (1969) (Emphasis supplied)

■ The sort and, sometimes, the number of contingencies which may serve to insulate the plaintiff from the chill or threat to his exercise of First Amendment rights is a further consideration. In Bond v. Fortson, 334 F.Supp. 1192 (N.D.Ga.1971) (three-judge court), for example, plaintiffs attempted to challenge, on grounds of racial discrimination, a run-off election system which would insure that members of Congress from Georgia would be elected ultimate-

ly by a majority of votes cast. The Court dismissed the complaint because the suit was brought far in advance of the elections when no candidate had filed, and when a run-off situation was not a certainty. The Supreme Court affirmed without opinion. 404 U.S. 930, 92 S.Ct. 272, 30 L.Ed.2d 244. *See also* Ackerman v. C. B. S., 301 F.Supp. 628 S.D.N.Y.1969 (Weinfeld, J.); *cf.* Bowes v. Commission to Investigate Allegations of Police Corruption etc., 330 F.Supp. 262 (S.D.N.Y.1971) (Tenney, J.).

A number of contingencies lurk in the stated concerns of the instant plaintiffs. Basic is whether plaintiffs actually will seek to publish or broadcast views so ambivalent with respect to a candidacy as to be perceived as "critical" by the candidate, but at the same time as "on behalf of" him by the media. Indeed, as in *United Public Workers, supra,* the Court is left to "speculate as to the kinds of political activity" the plaintiffs "desire to engage in" and "as to the contents of their prospective public statements." The only present certainty is that plaintiffs are members of a third-party. It may well be that the other contingencies, i. e., whether a candidate will refuse to furnish a certificate, whether the media will refuse to publish .or broadcast without it, whether defendants will refer the matter to the Attorney General for prosecution, will not operate in a First Amendment context. Only in a situation where the "ambivalent" statement will be made will all the contingencies arise.

■ The need for factual referents to narrow the issues in a given case is of recognized importance in determining justiciability. National Student Association v. Hershey, 134 U.S.App.D.C. 56, 412 F.2d at 1115. This need is particularly important when a new, complex and hitherto unconstrued statutory and regulatory scheme, one dealing with the confrontation of two interests each

grounded in the Constitution, is put into question. *Cf.* Communist Party v. Subversive Activities Control Board, 367 U.S. 1, 70–81, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961). Such a matter requires a sensitive balancing, best accomplished with a full set of facts before the Court.

■ Since the threat to plaintiffs remains reasonably remote, and since there is a particular necessity for more allegations of fact on which evidence may be adduced to determine the issues now only vaguely discernible in the complaint, the Court holds that this controversy is not of such immediacy as to confer jurisdiction on this Court to consider the attack on Title I.

*Title III: Provisions in Question*

While Title III represents "complete revision"[2] of the Federal Corrupt Practises Act of 1925, the new statute reaffirms the premise which undergirds the earlier act

> that public disclosure of political contributions, *together with the names of contributors* and other details, would tend to prevent the corrupt use of money to affect elections.[3] (emphasis added).

Congress revised the old law because it considered the reporting requirements pertaining to culminating general elections to be "inadequate for the purpose of keeping the electorate informed as to where political campaign money comes from . . ." H.R.Rep.92–564, 92 Cong., 1st Sess. 4.

Accordingly, Congress extended the disclosure requirements "to reach every kind of political activity" leading to the culminating general election. S.Rep.92–229, 92 Cong., 1st Sess. 57. As the Report of the Senate Committee on Rules and Administration, S.Rep.92–229, states:

> Every phase of the nominating process—preference primaries, conventions, primaries, runoffs, special and

---

**2.** S.Rep. 92–229, 92d Cong., 1st Sess. 57.

**3.** Burroughs and Cannon v. United States, 290 U.S. 534, 548, 54 S.Ct. 287, 291, 78 L.Ed. 484 (1934).

general elections, even the election of delegates to a constitutional convention—is brought within the specific coverage of this measure. Every candidate for nomination or election to Federal elective office . . . is brought within the scope of the bill; and political committees, whether national or local, so long as they individually accept contributions or make expenditures in an aggregate amount exceeding $1,000 during a calendar year are covered.

Plaintiffs contend that a number of the disclosure provisions of Title III "would have the effect of deterring some people from serving as officers of plaintiffs' clubs and deterring others from contributing money to plaintiffs for use by the Conservative Party and the clubs of which they are officers." Plaintiffs maintain that such persons would reasonably apprehend discrimination in respect to hire, tenure, and promotion in their employment because the ideas and views espoused by the New York Conservative Party are "unpopular in many employments, occupations, areas, labor unions and other groups holding economic power in New York State."

Specifically, plaintiffs challenge the requirement that "political committees" [4] and persons who receive contributions for political committees account for and keep records of contributions in excess of $10.00, records which include the name and address of the contributor. 2 U.S.C. § 432(a), (b), and (c)(2) (1972). Except with regard to its scope and the limitation to contributions in excess of $10.00, this requirement does not substantially go beyond the former law, 2 U.S.C. § 243 (1927).

Also in contention is the requirement that political committees which anticipate receiving contributions or making expenditures of $1,000.00 file a "statement of organization" containing the name and address of certain of the officers as well as other information as may be required by defendants. 2 U.S.C. § 433(a) (1972). The statements required to be filed under the old law did not have to contain the names of the principal officers of the political committee. 2 U.S.C. § 244 (1927).

Also challenged is the requirement that the treasurer of each political committee file a report containing the name and address of those persons who *contribute* an aggregate amount or value in excess of $100 in a calendar year and of those who *receive* expenditures by the committee in excess of that amount in the form of salaries, disbursements and the like. 2 U.S.C. § 434(a), (b). Except with respect to its scope, this does not appear to be substantially different from former 2 U.S.C. § 244(a).

Plaintiffs also contend that 2 U.S.C. § 435 is unconstitutional. That section requires every person, other than a candidate, who contributes an aggregate amount in excess of $100 in a calendar year, other than by way of contribution to a political committee, to file a statement with the supervisory officer. Individual contributors were also covered under the old law. 2 U.S.C. § 245 (1927).

The required documents are to be filed with the appropriate "supervisory officers" [5] and defendants here are sued in that capacity. Plaintiffs challenge their authority to make available for public inspection all reports and state-

---

4. "[P]olitical committee" means any committee, association or organization which accepts contributions or makes expenditures during a calendar year in an aggregate amount exceeding $1,000. 2 U.S.C. § 431(d).

5. "[S]upervisory Officer" means the Secretary of the Senate with respect to candi-

dates for Senator; the Clerk of the House of Representatives with respect to candidates for Representative in, or Delegate or Resident Commissioner to, the Congress of the United States; and the Comptroller General of the United States in any other case. 2 U.S.C. § 431(g).

ments filed under Title III, 2 U.S.C. § 438(a)(4), and to publish compilations of aggregate amounts contributed by any person shown to have contributed in excess of $100, 2 U.S.C. § 438(a)(7). Under the old law, all statements filed thereunder were deemed "public records . . . open to public inspection." 2 U.S.C. § 247(c).

In sum, plaintiffs challenge the sweep of Title III, the requirement that the names and addresses of officers be included in reports filed by political committees, and the greater degree of public access afforded to data filed with the supervisory officers.

*Title III: Whether a Substantial Constitutional Question Has Been Raised*

Defendants contend that this aspect of the complaint should be dismissed because the issue raised here is not ripe for decision either, because plaintiffs have no standing to raise the issue, or, because the issue itself as posed by this complaint raises no substantial question of the constitutionality of the statute. The issues of ripeness and standing are closely connected with the substantial question issue and the focus will be upon the latter.

■ As plaintiffs maintain, the vital relationship between the freedom to associate, protected under the First Amendment, and privacy in one's associations is well established. Gibson v. Florida Legislative Investigation Commission, 372 U.S. 539, 83 S.Ct. 889, 9 L. Ed.2d 929 (1963); Bates v. Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). But the right to such privacy is not an absolute right. There is no question that the government has power adequately to inform itself in order to protect its legitimate interests. *Id.* Thus the underlying questions to be answered are whether there exists (1) a substantial connection between the information sought and governmental in-

terest, which interest is (2) compelling and (3) overrides the right asserted by plaintiffs. *Id.* In addition this single judge court must determine whether an affirmative answer to the underlying questions is so obvious as to compel dismissing this aspect of the complaint without convening a three-judge court. California Water Service Co. v. Redding, 304 U.S. 252, 58 S.Ct. 865, 82 L.Ed. 1323 (1938).

The decided cases hold that when inquiry regarding an issue of constitutionality is foreclosed, convening a three-judge court is a needless waste of judicial time and energy. Johnson v. New York State Education Department, 449 F.2d 871 (2d Cir. 1971).

Defendants rely on Burroughs and Cannon v. United States, 290 U.S. 534, 54 S.Ct. 287, 78 L.Ed. 484 (1934) as a decision which forecloses inquiry here. Although *Burroughs and Cannon* dealt with the Federal Corrupt Practises Act of 1925, the underlying premise regarding the value of disclosure is equally applicable to the new law as it was to the old. The case does foreclose inquiry on the question of whether there is a substantial connection between the disclosure requirements of Title III and a compelling governmental interest. The following language, written in an era before the present media explosion, continues to be pertinent:

> Congress, undoubtedly, possesses that power [to pass appropriate legislation to safeguard an election from the improper use of money to influence the result], as it possesses every other power essential to preserve the departments and institutions of the general government from impairment or destruction, whether threatened · by force or by corruption.
>
> .    .    .    .    .    .
>
> Congress reached the conclusion that public disclosure of political contributions, together with the names of contributors and other details, would tend

to prevent the corrupt use of money to affect elections. The verity of this conclusion reasonably cannot be denied. [290 U.S. at 545, 548, 54 S.Ct. at 291]

However, it cannot be said that *Burroughs and Cannon* forecloses inquiry on the question of whether the undoubtedly compelling governmental interest served by disclosure provisions always overrides an individual's interest in maintaining privacy in his associations. No such question was raised or discussed in that case. Indeed, the cases which clarified the right of privacy asserted by plaintiffs were decided well after *Burroughs and Cannon*. Thus, the question for this Court narrows to whether there is any merit to plaintiffs' contentions that "some people" (not plaintiffs, obviously) will be deterred from serving as officers of the Conservative Party political committees or from contributing to plaintiffs' cause out of fear of the sort of reprisals which would place these people in the category of the unidentified members of the organizations involved in such cases as NAACP v. Alabama, *supra*. If this claim is "plainly lacking in merit", then this Court need not convene a three-judge court and may itself dismiss the complaint. Green v. Board of Elections, 380 F.2d 445 (2d Cir. 1967).

On the issue of whether disclosure under Title III results in an actual threat to anyone interested in supporting plaintiffs' cause, the Court is left by the complaint to speculate once again, with only the fact of membership in the Conservative Party as a referent.

The complaint fails to indicate that experience under the old Federal Corrupt Practises Act showed that reprisals may be expected from compliance with disclosure requirements under such laws; indeed no single instance of any such reprisal is alleged by the plaintiffs. The complaint also fails to allege instances of reprisal which may have resulted from any source of community knowledge of a person's identity arising from that person's support for the Conservative Party for its views. No act of reprisal, for example, has been alleged from disclosures required under the Campaign Receipt, Expenditures and Contributions law of the State of New York, §§ 320–328 of the Election Law (McKinney's Consol.Laws c. 17, 1964), a law which has been in effect substantially in its present form since 1949. Given manifold differences between the position of the Conservative Party in New York today and that of the NAACP in Alabama in the early 1960's, both in respect to the likelihood of reprisals and alternative remedies available, a demonstration based on appropriate allegations would seem necessary here to withstand the motion of the defendants. The fact that plaintiffs offer no factual basis for weighing their claims of unconstitutional invasion of privacy against the compelling state interest underlying Title III renders the complaint wholly speculative and substantively defective. It is not the function of the Court to act on imaginary hypotheses in passing on the constitutionality of therapeutic legislation such as the Act now challenged. A factual context should exist which would allow the Court to clarify—rather than to divine—the interests of the public, the media, the candidates and their supporters. It is sufficiently obvious that plaintiffs bold attack on Title III lacks merit and makes unnecessary the convening of a three-judge court in respect to this complaint.

Motion granted. Complaint dismissed.

So ordered.