John DOE and 1974 Socialist Workers Municipal Campaign Committee, Plaintiffs,

v.

Robert MARTIN, Chairman, District of Columbia Board of Elections and Ethics, et al., Defendants.

Civ. A. No. 75-0083.

United States District Court, District of Columbia.

Oct. 22, 1975.

John G. Murphy, Jr., Ralph J. Temple, Washington, D. C., for plaintiffs.

Winfred R. Mundle, Gen. Counsel, Board of Elections and Ethics, Washington, D. C., for defendants.

Before LEVENTHAL, Circuit Judge, GESELL and RICHEY, District Judges.

LEVENTHAL, Circuit Judge:

This civil action challenges on constitutional grounds certain disclosure and filing requirements of the 1974 District of Columbia Campaign Finance Reform and Conflict of Interest Act, Pub.L. 93–376, 88 Stat. 446, recently enacted to regulate political campaign finance practices during local elections in the District of Columbia. The Act requires, among other things, public disclosure both of names of contributors and recipients of political expenditures made during a campaign for nomination or election to the office of Mayor, or member of the City Council, School Board or Neighborhood Advisory Council. This Act closely followed enactment of the District of Columbia Self-Government and Governmental Reorganization Act, Pub.L. 93–198, 87 Stat. 774, granting

voting privileges to the citizens of the District of Columbia upon their acceptance of a proposed charter for the city's government.

The District Court initially certified the questions presented as substantial and this three-judge court was convened. Defendants, the D. C. Board of Elections and Ethics and its members, who are charged with enforcing the statute, now ask that the three-judge court be dissolved and have also moved to dismiss the complaint on the ground it fails to state a cause of action. Both these questions were heard by the three-judge court after submission of briefs.

Plaintiffs sought an exemption for the Socialist Workers Party from the disclosure provisions of the Act.[1] The Board by advisory opinion found that it did not have the power to grant such an exemption. Plaintiffs contend that in the absence of such an exemption the Act must be declared unconstitutional. The gravamen of the complaint is that disclosure of the names of contributors contributing $50 or more and the disclosure of expenditures made to others assisting the Party will subject those whose names are required to be disclosed to harassment by the FBI, employers and others.

■ We quickly dispose of the contention that a three-judge court is not required under *Goosby v. Osser*, 409 U. S. 512, 518, 93 S.Ct. 854, 35 L.Ed.2d 36 (1972). The precise issues here raised have never been decided by the United States Supreme Court and there is clearly room for disagreement on the issue presented given the conflict between ear-

lier cases upholding disclosure statutes and the subsequent development of the doctrine of associational privacy. *Compare Burroughs and Cannon v. United States*, 290 U.S. 534, 54 S.Ct. 287, 78 L. Ed. 484 (1934), and *United States v. Harriss*, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954), *with N. A. A. C. P. v. Alabama ex rel. Patterson*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), and *Shelton v. Tucker*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). *See also Printing Industries of Gulf Coast v. Hill*, 382 F.Supp. 801 (S.D.Texas), *vacated and remanded for reconsideration as to mootness*, 422 U.S. 937, 95 S.Ct. 2670, 45 L.Ed.2d 664 (1975).

I.

Turning to the merits, the motion to dismiss must of course be considered on the assumption that the facts pled can be established and, in particular, that the names, addresses and places of employment of those assisting the Party, absent any strictures to the contrary, will be noted by the FBI and others and that inquiries or other detrimental social pressures will ensue affecting employment and privacy.

This case presents the difficult question whether a generally valid law requiring disclosure of modest contributions to political parties can have constitutional application to an unpopular minority party, which alleges past harassment by Federal agencies in support of a claim of invalidity of the law as applied. This case also presents difficulties that did not have to be reached in the lawsuit of *Buckley v. Valeo*.[2] While

---

1. The specific provisions challenged are § 201(c), which requires every political committee to keep records showing the name, address and place of business of each $10 contributor; § 203(a), which requires each committee to designate a depository bank through which all its financial business will be done; § 206(b), which requires a report to the Board for public inspection of each $50 contributor's name, address and place of business; and § 306(b), which provides a civil penalty action for noncompliance.

2. *Buckley v. Valeo*, 519 F.2d 821 (D.C.Cir., 1975), probable jurisdiction noted, 423 U.S. 820, 96 S.Ct. 32, 46 L.Ed.2d 36 (1975). *See also American Civil Liberties Union v. Jennings*, 366 F.Supp. 1041 (D.D.C.1973) (3-judge court), 417 U.S. 944, 94 S.Ct. 3066, 41 L.Ed.2d 664 (1974), *vacated, sub nom Staats v. ACLU*, 422 U.S. 1030, 95 S.Ct. 2646, 45 L.Ed.2d 686 (1975); *United States v. Finance Committee to Reelect the President*, 165 U.S.App.D.C. 371, 507 F.2d 1194, 1200–02 (1974).

that was an action by minority parties and potential independent candidates, there was no significant showing of harassment of persons contributing to such parties or candidate. The present case, involving the Socialist Workers Party, brings before the court affidavits that the party's members have been harassed by other government agencies— the FBI; the Civil Service Commission; draft boards—and by private employers, in at least some measure after the FBI advised them of the employee's membership in this party. At least the affidavits on this point would entitle the plaintiffs to a trial if this matter should be considered to affect the outcome.

Such harassment, if proved, would significantly infringe on plaintiff's associational rights. In effect, the contribution disclosure requirement allegedly exacts as the price for monetary support of a candidate a willingness to risk not only social disapproval but harassment encompassing economic reprisals, loss of employment, and physical coercion and violence. Because the harassment potential is not confined to any one identifiable agency or group, preventive litigative relief is not a realistic remedy. An indicator of the substantiality of plaintiffs' fears is provided by a ruling of the Minnesota Ethics Commission—an agency empowered under the Minnesota Ethics in Government Act of 1974 [3] to grant exemptions from disclosing the identity of contributors to political associations where disclosure would expose individuals to "economic reprisals, loss of employment or threat of physical coercion." The Commission granted such an exemption to the Minnesota Socialist Workers 1974 Campaign Committee following hearings presenting episodes of the kind of harassment alleged in the complaint pending before us.[4]

---

3. M.S.A. § 10A.20, subds. 8, 9 provide:

Subd. 8. The commission shall exempt any association or any of its members or contributors from the provisions of this section if disclosure would expose any or all of them to economic reprisals, loss of employment or threat of physical coercion.

An association may seek an exemption for all of its members or contributors only if it proves by clear and convincing evidence that a substantial number of its members or contributors would suffer a restrictive effect on their freedom of association if members were required to seek exemptions individually.

Subd. 9. The commission shall exempt any individual from the provisions of this section who, by written request, demonstrates by clear and convincing evidence that disclosure would expose him to economic reprisals, loss of employment or threat of physical coercion.

4. The Commission's ruling (Case No. H–0001, Sept. 24, 1974) grants an exemption to the Minnesota Socialist Workers 1974 Campaign Committee from the requirement of reporting the identity of individuals contributing in excess of $100 to statewide candidates, and $50 to legislative candidates supported by the exempted Committee in the 1974 election campaign. The Commission's findings may be summarized in part, and quoted in part, as follows:

¶3. On March 21, 1948, the Attorney General included the Socialist Workers Party on its list of subversive organizations, and from 1968 to 1971, the F.B.I. conducted a "Socialist Workers Party Disruption Program" for the purpose of disrupting the Party's organized activities and frustrating efforts of leftist groups to consolidate and recruit adherents. "In furtherance of that purpose the Federal Bureau of Investigation conducted electronic surveilance [sic] of certain members of the Socialist Workers Party, made inquiries about some members and in the process of these inquiries disclosed to families, employers and landlords the association of the person being inquired about with the Socialist Workers Party. Further, the Federal Bureau of Investigation characterized the Socialist Workers Party as subversive in its discussion with families, landlords and employers. The Federal Bureau of Investigation also recruited spies within the ranks of the Socialist Workers Party."

¶4–5. The disruption program allegedly was terminated in 1971, but on January 23, 1973, a mail cover was placed on the Party's New York office. "As a result of that mail cover, the Federal Bureau of Investigation conducted an investigation of a 16 year old New Jersey school girl who wrote to the Socialist Workers Party headquarters as part of a civics project. The investigation included a check on the family credit, a check on the employment of the girl's father, a visit to the girl's school by an agent and a police check."

■ The Congressional enactment before the court includes a $10 contribution record-keeping provision and a $50 contribution disclosure requirement.[5] We find that the $10 contribution report requirements of the D. C. election law contains an implicit provision against disclosure except that which is inextricably and unavoidably involved in the processes of verification and audit. Giving those records a confidential status effectuates the Congressional audit provisions, while avoiding undue encroachment on associational interests through disclosure of even minimal financial support. See Buckley v. Valeo, supra note 2, 519 F.2d at 864–65.

## II.

■ In considering the contention that harassment resulting from contribution disclosure would unconstitutionally infringe on plaintiff's associational rights, we start from two basic postulates.

*First.* We entertain no doubt that Congress can put a limit on the amount of contributions to political parties and can require disclosure of substantial contributions even though under the legal maximum. Congress can properly achieve its purposes of limiting attempts to buy "influence" with elected candidates and of enhancing public perception of the legitimacy of the election process by requiring that "significant" party candidates seeking to influence public policy accept the publicity attendant to public disclosure of this active role. See Buckley v. Valeo, supra note 2, at 833–44.

■ In general, there is a rational nexus between Congress' objective of eliminating secrecy in substantial political contributions and the disclosure technique of regulation. *Burroughs and Cannon v. United States,* 290 U.S. 534, 54 S.Ct. 287, 78 L.Ed. 484 (1934); *United States v. Harriss,* 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954); *Buckley v. Valeo, supra* note 2; *Stoner v. Fortson,* 379 F.Supp. 704 (N.D.Ga. 1974, 3-judge court). Absent allegations of harassment, there is also a rational basis for applying the disclosure regulatory device to minority parties. The problem of "undue influence" of monied and special interests, and their pursuit of candidates who will have the power of government to help their friends and hinder the enemies, is largely the problem of contributions to majority parties. But minority parties also influence election outcomes. They divert votes from one or another better supported candidates, occasionally forge ahead to win races, and can be used as stalking horses (particularly in local elections). There is also the problem of appearances—the possibility of citizen anxiety stemming from keeping part of the process secret, engendering the suspicion that what is not accounted for has some connection with undue influence on those elected. Thus omission of minority parties from a general disclosure scheme could seri-

"That the Socialist Workers Party has been harassed by persons whose identities are not known. The Socialist Workers Party's Houston Office has been bombed. Its Los Angeles Office was raided by twelve armed men who terrorized the occupants and then set fire to the premises. Its Chicago and New York Offices have been burglarized and the Chicago Office files turned over to Military Intelligence."

¶6. There is only surmise, without evidentiary value, in many of the incidents of harassment set forth in 60 affidavits filed by 24 members of the Party residing in Minnesota. "Other affidavits, however, indicate that two Socialist Workers Party members were fired because of their political affiliation. One Socialist Workers Party member had to move from her apartment because of her association with the Party. At least three persons have refused to join the Party for fear membership would expose them to harassment. One affidavit states that no Minnesota industry holding a defense contract will hire a member of the Socialist Workers Party."

5. 1974 District of Columbia Campaign Finance Reform & Conflict of Interest Act, Pub.L. 93–376, 88 Stat. 446, §§ 201(c), 206 (b).

ously undercut the Act's objective of enabling the voting public to consider the identity, concerns, and interests of those whose contributions fund the campaigns aimed at their votes.

"This controversy is thus not of a pattern with such cases as *N. A. A. C. P. v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 and *Bates v. Little Rock,* 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480. In those cases the Court held that there was no substantially relevant correlation between the governmental interest asserted and the State's effort to compel disclosure of the membership lists involved." *Shelton v. Tucker,* 364 U.S. 479, 485, 81 S.Ct. 247, 250, 5 L.Ed. 2d 231 (1960). Here, by contrast, the efficacy of a disclosure statute implementing Congress' decision to rid the election process of the corrupting effects of secret contributions, is clear.

■ *Second.* In varying contexts, the political freedom of the individual to support minority parties and dissident groups and the corollary associational right of privacy have been constitutionally protected by prohibiting compulsory membership disclosure in the absence of a compelling interest. The importance of these rights is underscored by the potential of unorthodoxy to be established in time as the vanguard of democratic thought.[6] The doctrine evolved principally in cases enjoining disclosure of membership in the N. A. A. C. P.,[7] but extends broadly to instances where "identification and fear of reprisal might deter perfectly peaceful discussions of public matters of importance." [8]

In the broad, these cases have protected individual associational interests

from government action that fosters persecution. In cases where the government fails to advance a fundamental state interest while infringing these associational rights, government action that singles out a minority party in the context of proven past harassment or that merely sets the stage for private harassment has been held to be in violation of the Constitution. Thus in *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 462–63, 78 S.Ct. 1163, 1172, 2 L.Ed.2d 1488 (1958) the Court emphasized the "crucial . . . interplay of governmental and private action" in holding that past evidence of "economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility" made it likely that compelled membership disclosure would adversely affect the NAACP's collective effort to associate to foster common beliefs. The importance of protecting effective political association, recognized in *NAACP v. Button,* 371 U.S. 415, 431, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) similarly requires protecting minority party member privacy faced with public persecution and threatened reprisals. Thus in *Sweezy v. New Hampshire,* 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957), the Supreme Court, by a 6–2 vote, sustained the position of a state university professor who answered questions of the state's legislative branch concerning the Communist Party, but refused to answer questions concerning his knowledge of the Progressive Party and its members, on the ground that by inquiring into the activities of a lawful political organization, they infringed upon the inviolability of his right to privacy in his political

6. *See Sweezy v. New Hampshire,* 354 U.S. 234, 251, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957).

7. *NAACP v. Alabama,* 357 U.S. 449, 78 S. Ct. 1163, 2 L.Ed.2d 1488 (1958) ; *Bates v. Little Rock,* 361 U.S. 516, 80 S.Ct. 412, 4 L. Ed.2d 480 (1960) ; *Louisiana ex rel. Gremillion v. NAACP,* 366 U.S. 293, 81 S.Ct. 1333, 6 L.Ed.2d 301 (1961) ; *Gibson v. Florida Leg. Investigation Comm.,* 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963).

8. *Talley v. California,* 362 U.S. 60, 65, 80 S. Ct. 536, 539, 4 L.Ed.2d 559 (1960) (invalidating ordinance prohibiting distribution of any handbill not showing identity of sponsor) ; *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960) (invalidating law requiring every teacher to list all organizations to which he belonged or regularly contributed).

associations. The plurality opinion of Chief Justice Warren, for four justices, held that the state had not established a "'fundamental" state interest required to permit inquiry on party affiliation (354 U.S. at 251–2, 77 S.Ct. 1203). Justice Frankfurter's concurring opinion (joined by Justice Harlan) put it (354 U.S. at 265, 77 S.Ct. at 1219):

> For a citizen to be made to forego even a part of so basic a liberty as his political autonomy, the subordinating interest of the State must be compelling. Inquiry pursued in safeguarding a State's security against threatened force and violence cannot be shut off by mere disclaimer, . . . But the inviolability of privacy belonging to a citizen's political loyalties has so overwhelming an importance to the well-being of our kind of society that it cannot be constitutionally encroached upon on the basis of so meagre a countervailing interest of the State as may be argumentatively found in the remote, shadowy threat to the security of New Hampshire allegedly presented in the origins and contributing elements of the Progressive Party and in petitioner's relations to these.

In *Pollard v. Roberts*, 283 F.Supp. 248 (E.D.Ark.), *aff'd*, 393 U.S. 14, 89 S.Ct. 47, 21 L.Ed.2d 14 (mem. 1968), the 3-judge district court, which included then Circuit Judge Blackmun, enjoined enforcement of subpoena of a prosecuting attorney seeking information on contributions to the Republican Party of Arkansas, on the ground that the investigation of alleged vote buying was not sufficiently connected with the disclosure of contributions to constitute a compelling state interest. The opinion reviews the privacy decisions as embracing the broad rationale that the Constitution protects the rights of people to associate in controversial, but legitimate, political or social action; that when the group or its objective is unpopular at a given time or place, the occurrence or apprehension of reprisals, from revelation of identity, tends to discourage exercise of constitutional rights. (p. 256). The court referred to the Republican Party of Arkansas as "a minority party as far as numbers of regular adherents are concerned." (p. 258).[9]

## III.

The question to be decided here is the validity of minority party disclosure provisions that in application can lead to harassment resulting in substantial infringement of associational freedoms. As formulated in *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968) the issue is whether the restriction on First Amendment associational freedoms "is no greater than is essential to the furtherance of [the governmental] interest." As pointed out by the Supreme Court in *Jenness v. Fortson*, 403 U.S. 431, 441, 442, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971), there may be invidious inequality in giving the same treatment to major and minor parties and ignoring their crucial differences. Similarly, equal treatment of differently circumstanced minority parties may result in infringement of constitutional rights. A statutory scheme that blocks minority party access to the electoral process un-

---

9. Of course, the right of political privacy is not absolute. Thus, in *Communist Party v. Subversive Activities Control Board*, 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961) the Court upheld a registration requirement on the Communist Party on the basis that it was the agency of a foreign power and posed a threat to the government itself.

In this connection it should be noted that as early as 1962 it had been judicially determined, in a deportation proceeding, that there was "no substantial evidence in the record that the Socialist Workers Party advocates or teaches by its 'Declaration of Principles and Constitution' the violent or forceful overthrow of the government of the United States within the meaning of the test laid down by Scales and Noto." *Scythes v. Webb*, 307 F.2d 905, 909 (7th Cir. 1962).

justifiably invades the right to vote and to associate.[10]

■ Competing associational and governmental interests must be weighed in a concrete factual situation. Unlike the plaintiffs in *California Bankers Assn. v. Shultz,* 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974)[11] and in *Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972),[12] the specific allegations of harassment in this case, if substantiated, provide the record ripeness necessary to adjudicate SWP's associational claims. Moreover, the Socialist Workers' Party can properly assert this claim for its members, for "to require that it be claimed by the members themselves would result in nullification of the right at the very moment of its assertion." *NAACP v. Alabama ex rel. Patterson,* 357 U.S. at 459, 78 S.Ct. 1170.

■ Plaintiffs allege instances in the past of government harassment, government initiation or sparking of private harassment, and private harassment independent of any government "invitation" to initiate it. We hold that at least where the government can be shown to have gone beyond mere enforcement of a valid general policy and to have used its special powers to embark on active facilitation of private harassment, the resulting "chilling" intermesh of governmental and private harassment improperly violates 1st Amendment rights. We do not address the separate question of whether independently initiated private harassment based on membership disclosure would give rise to a constitutional violation. In the context of a compelling government interest in disclosure as a means of avoidance of corruption and enhancing public awareness of and confidence in the electoral process, some incidental burden on associational rights may have to be tolerated.

The balance between associational rights and governmental interests must necessarily be delicately drawn where both government and private rights are substantial. This is not a case like *NAACP v. Alabama ex rel. Patterson, supra* note 7 where the insubstantiality of the government interest was patent

---

10. *Williams v. Rhodes,* 393 U.S. 23, 31, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); *Lubin v. Panish,* 415 U.S. 709, 716, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974); *Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974).

11. In *California Bankers Assn. v. Shultz,* 416 U.S. 21, 56, 94 S.Ct. 1494, 1515, 39 L.Ed.2d 812 (1974), the Court upheld the general validity of a statute requiring financial institutions to keep records of customers' identities and films of their checks. The Court then addressed itself to the claim of the American Civil Liberties Union that these provisions could be used to ascertain the identity of its members, in violation of their constitutional rights. The Court did not dismiss this contention as obviated by the general validity of the law, but said that this contention was premature since no such disclosure had been sought by the Government: the Court "in the absence of a concrete fact situation in which competing associational and governmental interest can be weighed, is simply not in a position to determine whether an effort to compel disclosure of such records would or would not be barred . . . ."

12. In *Laird v. Tatum,* 408 U.S. 1, 13–14, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972), the Court held that the mere existence of the Army's investigative activity was not an adequate ground for a legal challenge by protest groups, since "allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or threat of specific future harm." *Cf. Stoner v. Fortson,* 379 F.Supp. 704, 710 (N.D.Ga.1974, 3-judge court) where all that was alleged by the plaintiff, was that he was a "controversial" candidate for the Democratic nomination for lieutenant-governor of Georgia; and *Pichler v. Jennings,* 347 F.Supp. 1061 (S.D. N.Y.1972), where the court dismissed a suit challenging the Federal Election Campaign Act of 1971, because plaintiffs offered no factual basis for weighing their claims of unconstitutional invasion of privacy against the compelling state interest underlying the general reach of the law. Judge Pollack referred to the "manifold differences between the position of the Conservative Party in New York today and that of the NAACP in Alabama in the early 1960's, both in respect to the likelihood of reprisals and alternative remedies available." (p. 1069).

and where *any* infringement of First Amendment rights was suspect. The validity of the governmental approach here instead is enhanced by permitting contributions below a cutoff point to be made and received without disclosure, a provision that covers a large percentage of political contributors, gives some privacy to the individual who wishes to participate and some elbow room for the party to get contributions even from those concerned with privacy. Nor will petitioners be deprived of all rights "to engage in lawful association in support of their common beliefs" if they are not exempted from disclosure 357 U.S. at 460, 78 S.Ct. at 1170. Their interest in running candidates for election is substantial, for the Supreme Court has already made it clear that the principle of fluidity in American political life is hospitable to the presentations of independent candidates and third parties. *See American Party of Texas v. White,* 415 U.S. 767, 787, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974) *quoting Jenness v. Fortson, supra,* 403 U.S. at 439, 91 S.Ct. 1970; *Lubin v. Panish,* 415 U.S. 709, 716, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974); *Williams v. Rhodes, supra.* Running candidates is not, however, the only mode of political participation available to them. But when the chills and fears of the minority party arising from public disclosure of contributions are buttressed by a substantial history of government harassment and reprisal intermeshed with private action, we have a combination of substantial, effective impingement of associational freedoms on the one hand and a lack of consequent state interest on the other. The capabilities of government deliberately employed to facilitate private community pressures offer a powerful engine to undermine group association, "particularly where a group espouses dissident beliefs." *NAACP v. Alabama ex rel. Patterson,* 357 U.S. at 462, 78 S.Ct. at 1172.

■ To avoid misunderstanding, we do not contemplate carving out of the statute an exception making disclosure requirements broadly inapplicable to minority parties and independent candidates. Disclosure may well shrink contributions to minority parties. Indeed, disclosure may well shrink contributions to major parties—middle rank executives of corporations may be concerned lest their colleagues (and especially their superiors) learn of their contributions to a labor-oriented party, and middle rank executives of labor unions might likewise be concerned lest their colleagues and superiors learn of contributions to a business-oriented party. The limitation on political privacy beyond the cutoff point may affect a wide array of personal concerns that cannot be dismissed as fanciful. But the legislative program serves too important an interest to subject it to excisions on "allegations of a subjective 'chill'" based on the real or perceived "controversial" character of the candidate. Such allegations "are not an adequate substitute for a claim of specific present objective harm," *Laird v. Tatum,* 408 U.S. at 14, 92 S.Ct. at 2326.

Our view suggests a very limited inapplicability of disclosure requirements and does not countenance secrecy for the party concerned. It would still be subject to the general regulatory scheme, apart from public disclosure, to limits specified for contributions and expenditures and to the requirements that it keep records, and be subject to an audit, established in order that those limits can be monitored.[14] There would thus always be possibility of disclosure to the appropriate government agency, both in enforcing maximum limits on contributions and expenditures and in investigating to make certain that the party is a genuine political organization and not a shield. But such disclosures to agencies administering general statutes are a

14. See text at note 5 *supra.* The records could be used only by the District of Columbia Board of Elections and Ethics for purposes of enforcing the District of Columbia Campaign Finance Reform and Conflict of Interest Act.

lesser intrusion on privacy then reports made public to the world at large. In addition, there would be a possibility of disclosure to the public incident to monitoring, if there were probable cause to believe violations had occurred. But the elimination of routine and automatic public disclosure of contributors to unpopular minority parties that have been harassed, would remove a measure that opens the door to further harassment, in a context where it is unlikely that what will be disclosed will bear significantly on the election,[15] and where the particular withholding of disclosure will not undercut the overall objectives of election reform maintainable through the Act's other provisions. In these circumstances, the net balance of state interest in disclosure is too slight to justify the encroachment on associational freedoms.

### IV.

 Our conclusion that the Act would be potentially unconstitutional as applied to the plaintiffs does not necessarily lead to a constitutional ruling *per se*. This is rather a case where constitutional doctrine constitutes background that serves, together with our duty to construe statutes so as to avoid serious constitutional questions, to point our way toward an interpretation of the statute that enables the Board to provide an appropriate remedy. Even where the constitutional questions must be ruled on directly, it is within this court's power to direct the Board to provide a suitable forum for plaintiffs' claims and, should those claims be proved, an appropriate remedy. *See Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 647–48, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); *Vlandis v. Kline*, 412 U.S. 441, 93 S.Ct. 2230, 37 L. Ed.2d 63 (1973); *Bell v. Burson*, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971). We conclude that the statute empowers the Board to issue declarations of the Act's inapplicability, a power derived from the Board's broad rulemaking function [16] and its authority to issue advisory opinions as to whether "any specific transaction or activity . . . would constitute a violation of any provision of this Act.[17] . . ." We are aware that the Board has indicated by advisory opinion that it has no jurisdiction to issue an exemption. We have no quarrel with the approach that the Board has no authority to exercise administrative discretion to carve an exception out of the Act's coverage. What we hold is that the Board has authority to issue a ruling as to the limited coverage of the Act. In considering a petition for an inapplicability ruling, the

15. As to such parties, the incentive to further harassment persists, even where they involve neither a meaningful likelihood of political influence now or in the future, nor a *public discernment that influence is for sale,* nor the potential of enough voter attraction to serve the purpose of a stalking horse candidacy.

16. Section 306(a), Pub.L. 93–376, 88 Stat. 458 provides: "On and after the date of the enactment of this Act, the Board of Elections of the District of Columbia established under the District of Columbia Election Act (D.C.Code, sec. 1–1101 et seq.) shall be known as the 'District of Columbia Board of Elections and Ethics' and shall have the powers, duties, and functions as provided in such Act . . . and in this Act." The Election Act provides that the Board shall "prescribe such regulations as it considers necessary in order to carry out the purposes of this chapter;" *D.C.Code* § 1–1105(a)(8)

(Supp. II 1975), *amending D.C.Code* § 1–1105(a)(8) (1973). The legislative history of the Election Act also indicates that the Board was given "a broad grant of rulemaking authority . . . relating to all aspects of the Election Act." S.Rep.No.371, 93d Cong., 1st Sess. 3 (1973).

17. Section 306(c), Pub.L. 93–376, 88 Stat. 459. An interpretation of the Act yielding the conclusion that the Board has the statutory authority to grant exemptions on the basis of unconstitutional applicability would also comport with this court's duty to construe statutes, "whenever possible so as to uphold their constitutionality." *United States v. Vuitch*, 402 U.S. 62, 70, 91 S.Ct. 1294, 1298, 28 L.Ed.2d 601 (1971). Moreover, there is nothing in the legislative history of the Act which would preclude such an interpretation. *See* H.Reps.Nos.1080 and 1225 and S.Rep.No.967, 93d Cong., 2d Sess. (1974).

Board would establish regulations governing availability of such rulings and then hold a hearing pursuant to those regulations and this court's opinion on whether the Act can be applied constitutionally to a party requesting such a ruling. While it is true that administrative bodies do not normally consider questions going to the constitutionality of the legislation from which their authority derives, "[w]e commit to administrative agencies the power to determine constitutional applicability." [18]

At this time, the court will enter its order denying defendants' motion to dissolve the three-judge court, and denying defendants' motion to dismiss the complaint on the merits. The court will enter an order dismissing the complaint without prejudice, in order that plaintiffs may exhaust the administrative remedy available to them, as set forth in the opinion of this court.

GESELL, District Judge (dissenting):

I am unable to agree. The Commission has no power to exempt by regulation or otherwise. Not only has the Commission itself so determined, but this point was not contested at the hearing on the motion. A three-judge court cannot legislate by reading into the statute undefined terms such as "harassment" and "minor party" or attempt to create an exempting power by a process which Congress did not authorize.

Moreover, the majority's special concern for "minor" parties in this situation is misplaced. If the challenged disclosure provision offends the First Amendment, both major and minor parties subject to it, including their respective contributors, should be treated the same. "Harassment" is just as obnoxious and sometimes just as likely to succeed if it is directed against a majority party and its contributors. Surely the recent relevations as to experience under the last administration demonstrate that supporters of the opposition were not immune. In short, the disclosure provision must stand or fall in its entirety without benefit of a special judicially created exemption developed solely for the benefit of "minor" parties and their adherents.

Political discussion and argument are the life blood of a representative democracy. As important as these things are, however, it is equally important for citizens to know who is doing the talking and the arguing. There is too much sham in the land. An open and fair election is the culmination of a process that exemplifies our commitment to preserve essential First Amendment values. Disclosure is an effective prophylatic for removing improper influences on free debate, particularly in municipal elections where many so-called "minor" parties may participate and influence results.[1] Full disclosure thus enhances the First Amendment, and Congress act-

---

18. 3 K. Davis, Administrative Law Treatise § 20.04 (1958), at 74. *Cf. Metcalf v. Swank*, 444 F.2d 1353, 1355–56 (7th Cir. 1971), *vacated and remanded on other grounds*, 406 U.S. 914, 92 S.Ct. 1778, 32 L. Ed.2d 1113 (1972).

1. Allan Budka, the Socialist Workers Party candidate for the post of Chairman of the City Council in the 1974 D.C. elections received 2,587 votes out of a total of 91,412, 21 *D.C.Register* 1072 (Nov. 29, 1974), or 2.83 percent of the total vote.

Historically, 2.83 percent of the vote is sufficient to change the result in a great many elections. Of the 34 United States Senators elected in 1974, nine would have

been defeated if less than 2.83 percent of the vote had been shifted to their opponents. Ten of the 35 state governors elected in 1974 would have lost if 2.83 percent of their vote had been shifted to their opponents. Fifty-one Congressmen were in that situation. *See* 22 Cong.Quarterly Weekly Report 3084–3091 (Nov. 9, 1974). Past elections have been similarly close. Forty-six of 204 Senate elections held in the years 1964–74 were sufficiently close that a 2.83 percent shift in the vote would have changed the outcome. *See* 2 Cong.Quarterly, Congress and the Nation, 1964–68, at 34–5 (1969); 3 *id.*, 1968–1972 at 38–40 (1973); Cong.Quarterly Weekly Report, *supra*.

ed to strengthen these constitutional values in our election process by providing this simple method for monitoring the selection and support of candidates for public office.

The election process has traditionally been subject to numerous governmental regulations. The power of Congress to regulate campaign practices in the Nation's Capital by eliminating secrecy in election campaigns to restore confidence in our democratic process is not subject to dispute. In fact, the legislature had a substantial if not compelling interest. *Cf. Storer v. Brown,* 415 U.S. 724, 736, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). The ultimate issue presented is only whether the statute as drafted is overly broad in its attempt to accomplish a legitimate end. Congress acted upon a wealth of persuasive data demonstrating the need for disclosure, emphasized so obviously by recent developments in the political arena. The provisions of the Act serve a well-defined and proper legislative purpose, and any harassment that may theoretically occur would be only collateral to essential disclosure which the legislative purpose rationally requires.

In the present situation it cannot be said that a claim of unconstitutionality is sustainable. *See United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); *Stoner v. Fortson,* 379 F.Supp. 704 (N.D.Ga.1974) (three-judge court). The requirements of the statute are very precise, not vague. Moreover, there is nothing in the legislative history or in the rules and regulations governing the administration of the Act which suggests in the slightest way that the legislation was designed obliquely or otherwise to flush out unnecessarily the names of contributors to unpopular or controversial parties such as the Socialist Workers Party. *Com-*

*pare N. A. A. C. P. v. Button,* 371 U.S. 415, 445–46, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) (Douglas, Jr., concurring). The Socialist Workers Party, which follows the teachings of Trotsky in interpreting Marx, Lenin and Engels, can express its views on aspects of the campaign free of disclosure so long as it does not undertake to further the interests of anyone it has nominated. The Act goes even further. It contains an exemption which would permit party candidates to run without making the disclosures complained of so long as each candidate's total campaign spending does not exceed $250, Pub.L. 93–376, § 209, and the disclosure of contributors' names is not required where an individual contributes less than $50, § 207(b)(2).

If governmental or private interests in fact improperly retaliate against a voter or his party because of beliefs or attitudes expressed and such retaliation is demonstrably caused by disclosure resulting from the operation of the Act, surely Congress and the Federal Judiciary can and should intervene.

However, at this stage the Court should deal with fact, not conjecture, and should hesitate to invalidate this important effort to improve the electoral process even before the Act is tested through actual experience and plaintiffs are required to comply.[2] In practice, it may be impossible to make the showing required by the majority since, as Chief Judge Bazelon has effectively discussed in his separate opinion in *Buckley v. Valeo,* there are substantial difficulties in providing the proof necessary to claim an exemption. More importantly, the Court may be doing great damage to the privacy of individuals who support unpopular causes, for it is unnecessarily creating an annual exemption process which by its very nature may well be far more offensive under the First

---

2. It should be noted that plaintiffs have never made the disclosures required by the Act and yet they recite a long experience with harassment arising from their views. Perforce they must contend the Act makes the air more chilling, but no court has provided the legal thermometer for measuring the constitutional significance of a statute that may hypothetically lower the temperature on an already cold night.

Amendment than the theoretical effects of the statute itself.

Assuming the controversy presented is ripe, I would uphold the statute, and therefore I must respectfully dissent.

## ORDER

This three-judge constitutional court, convened pursuant to 28 U.S.C. § 2284, has before it defendant's motion to dissolve the three-judge court or, in the alternative, to dismiss the complaint on the merits. Upon consideration thereof, including oral argument for the respective parties, and in accordance with the opinion of the Court of even date herewith, it is, by the Court, this 22 day of October, 1975,

Ordered, that the complaint be, and the same hereby is, dismissed without prejudice, in order that the plaintiffs may exhaust their administrative remedies before the District of Columbia Board of Elections and Ethics, established under Pub.L. 93–376, 88 Stat. 446.

GESELL, District Judge (dissenting).

I respectfully dissent from the foregoing for the reasons set forth in my dissenting opinion.