**UNITED STATES of America**

v.

**FINANCE COMMITTEE TO RE-
ELECT THE PRESIDENT,
Appellant.**

**No. 73–1918.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 24, 1974.

Decided Dec. 2, 1974.

Leon T. Knauer and John M. Facciola, Washington, D. C., with whom Kenneth Wells Parkinson and Nicholas S. McConnell, Washington, D. C., were on the brief, for appellant.

Craig C. Donsanto, Atty., Fraud Section, Crim. Div., Dept. of Justice, with whom Henry E. Petersen, Asst. Atty. Gen., Harold Titus, U. S. Atty. at the time the brief was filed and Richard S. Stolker, Atty., Crim. Div., Dept. of Justice, were on the brief, for appellee. Walter T. Barnes, Atty., Dept. of Justice, also entered an appearance for appellee.

Before LEVENTHAL and ROBINSON, Circuit Judges, and NICHOLS,* Judge, United States Court of Claims.

NICHOLS, Judge:

This Appeal concerns the conviction of Appellant Committee on a three-count Information under the Federal Election Campaign Act of 1971, 2 U.S.C. §§ 431–454 (Supp. II, 1972) (which repealed and replaced, effective April 7, 1972, the old Corrupt Practices Act of February 28, 1925, Ch. 368, Title 3, §§ 301–319, 43 Stat. 1070–1074; 2 U.S.C. §§ 241–256 (1970).)

Count One charged that the Committee Chairman, Mr. Maurice Stans, failed to report within 5 days to the Committee Treasurer, Mr. Hugh Sloan, a detailed account (including donor's name, address, occupation, and business address) of a $200,000 cash contribution received by Mr. Stans on April 10, 1972, in Washington, D.C., from agents of Mr. Robert Vesco.

Count Two charged that Mr. Sloan, failed to keep a record of the information specified in Count One concerning the contribution of $200,000.

Count Three charged the Committee with failing to report the contribution described in Counts One and Two, on or after June 10, 1972, in reports filed with the GAO (General Accounting Office).

No individual was accused in any count. Certain facts were stipulated and others were put before the court with Appellant's motion for a verdict of not guilty, which the court denied. The Appellant Committee waived jury trial and was convicted on all three counts and sentenced to a fine of $1,000 on each of the three counts. For the reasons given below, we affirm the conviction on all three counts.

The statute, cited *supra*, on and since April 7, 1972, has required that "Every person who receives a contribution in excess of $10 for a political committee shall * * * within five days after receipt of such contribution, render to the treasurer a detailed account thereof, including the amount, the name and address (occupation and principal place of business, if any) of the person making such contribution, and the date on which [it was] received * * *", 2 U.S.C. § 432(b). Mr. Stans, having been promised a contribution of over $200,000 by Mr. Vesco, orally and not in writing, before April 7, received $200,000 from that source after April 7, on April 10. He did not inform the Treasurer Mr. Sloan, of the identity of the donor or the date of receipt. The statute further provides, in § 441, that "[a]ny person who violates any provision of this title shall be fined

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

not more than $1,000 or imprisoned for not more than one year, or both." These are the facts proved as to Count One.

The statute further requires the Treasurer "to keep a detailed and exact account" of all contributions over $10, and "the full name and mailing address" of every donor of such a contribution. 2 U.S.C. § 432(c). Mr. Sloan did not do this and this is the gravamen of Count Two. The statute further requires a report by the treasurer of a "political committee" the tenth day of each June, with the "appropriate supervisory office" in this case the GAO. The report had to show "the full name and mailing address" of anyone making a "contribution" in excess of $100, § 434(a) and (b)(2). The Treasurer did not do this respecting the Vesco contribution, and this is the gravamen of Count Three.

The statute also defines a "contribution" as "a gift, subscription, loan, advance, or deposit of money * * *" (§ 431(e)(1)), and "a contract, promise, or agreement, whether or not legally enforceable, to make a contribution * * *" (§ 431(e)(2)).

The Comptroller General being designated as the "supervisory officer" in the case of contributions to influence Presidential contests (§ 431(g)), the GAO was to be the recipient of the above reports and by regulation prescribe forms of reporting which will be dealt with hereinafter.

The Appellant raises five issues on appeal, four attacking the proceedings below and the fifth the constitutionality of the statute.

I

In challenging the sufficiency of the evidence, Appellant says, as to Counts One and Two, that the stipulation on which the case was submitted contains no statements with respect to the alleged failure of defendant's Chairman [Mr. Stans] to render a detailed account of the transaction to the Treasurer [Mr. Sloan] or the alleged failure of the Treasurer to maintain a complete record thereof.

There is no signed text of a stipulation in the appellate record. In the Government brief opposing the motion for a verdict of not guilty is a statement of facts ending with the words: "The United States hereby agrees to the stipulation of these facts as stated above." This statement omits what Appellant says it omits. Appellant's counsel made similar statements in oral argument before Judge Hart that might be called a stipulation. However, with Appellant's memorandum in support of the motion, it submitted a Report by the Office of Federal Elections, General Accounting Office, which supplies the missing facts and a great deal more. Mr. Stans is quoted as saying no record was made of the Vesco transaction. Mr. Sloan, through his attorney, advised the GAO that the identity of the donor was not disclosed to him and he dealt with the funds as pre-April 7 contributions.

We are at a loss to explain why Appellant attached this report to its motion if it was not to inform the trial court what the conceded facts were, and direct that court's attention to the legal issues which these conceded facts would raise, in Appellant's opinion. Appellant said nothing to reserve any question as to whether the GAO report was factually correct. The trial judge found the facts as revealed in the GAO report, and in moving for rehearing, Appellant made no complaint of his having done so without support of evidence. Appellant never contended until the case came before us that proof of necessary factual elements was missing. In the circumstances, we conclude that the trial court treated the GAO report as evidence supplementing the stipulation. This was not a case where the Government had put in all its proof and rested, so that it could be subject to a motion that the Government's proof was not sufficient to support a conviction. We see no basis for reversal.

Neither Mr. Sloan nor anyone else ever properly entered the $200,000 on the Committee Treasurer's books.

On the Third Count, Mr. Stans himself swore that the $200,000 was reported as

CASH ON HAND ON APRIL 7, 1972, in the June 10, 1972 report, even though physical delivery did not occur until April 10, 1972.

## II

Appellant's second contention is that there was no proof of its criminal intent and that proof was required.

Appellant admitted that its entire Committee organization was dissolved and re-established on paper, so that the pre-April 7 Committee would never legally exist under the new act (and be subject to reporting and discovery procedures). Committee personnel were encouraging all donations to be made during the pre-April 7 secrecy period. They were well aware that the donor's right to secrecy ended April 7. Committee attorneys spent many, many hours reviewing each detail of the old and new laws. Delivery of the Vesco $200,000 cash was made in such a manner of secrecy that no records would exist. Only Mr. Vesco, his two agents, and Mr. Stans knew the details of the delivery. Mr. Stans admitted that he treated the $200,000 as a pre-April 7 contribution and he deceptively reported it as "CASH ON HAND" on April 7, even though physically received on April 10.

The former 1925 Corrupt Practices Act, 2 U.S.C. § 252, was the predecessor and starting point for the Act here to be construed. It had separate sections prescribing punishments for "willful" violations and for violations without that adjective. On conviction in the former category, punishments could be imposed more severe than for those in the latter, and the maximum for the latter, one year's imprisonment or $10,000 fine, happen to be the same as those under the present Act. Since the present Act § 441, says nothing about "willful" violations, it is reasonable to suppose, given this background, that the Congress intended that the elements of a non-willful offense, whatever it might be, were all that was necessary for a conviction.

This, however, does not get us very far. In Burroughs & Cannon v. United States, 290 U.S. 534, 54 S.Ct. 287, 78 L.Ed. 484 (1934), the Supreme Court held that certain counts in an indictment, under the non-willful section of the 1925 Act, were invalid because they did not allege the defendants "knowingly" violated the law. Thus the mental state of the accused comes back into the case and the present § 441, given this background, does not assess absolute liability regardless of *scienter*. Still the Supreme Court cannot be said to have overridden the view expressed in the case below in this court, 62 U.S.App.D.C. 163, 65 F.2d 796 (1933), that the non-willful section would punish a failure to report as required because of carelessness, inadvertence, or neglect, or because of ignorance of the law. There may be exceptions, but the majority of offenders in those categories would have knowledge of facts putting them on notice that they had a legal duty in the premises, and thus could properly be indicted for a "knowing" violation. To construe the statute otherwise would leave one hard put to determine what difference the Congress intended to exist between willful and non-willful violations. In Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), Mr. Justice Jackson reads the requirement of *scienter* back into a wide variety of statutory criminal enactments that lack any such express provision, but he distinguishes as a matter of statutory construction offenses "* * * in the nature of neglect where the law requires care, or inaction where it imposes a duty." P. 255, 72 S.Ct. p. 246.

The Appellant's officers in this case were well aware that the new statute existed. They or their counsel had spent hours reviewing it. They had urged those who desired non-publicity for large gifts to contribute before April 7. The secrecy Mr. Stans maintained as to the Vesco gift, concealing its date and source even from the Treasurer, Mr. Sloan, speaks for itself. So does the false reporting of the gift as "CASH ON HAND" on April 7. Secrecy or openness in the involved transaction are clear in-

dicators of guilty intent or its absence. We are not concerned with the defense of ignorance Mr. Sloan might be able to interpose if he were personally prosecuted. Mr. Stans' knowledge is imputable to the Appellant.

█ Appellant may have hoped—doubtless did—that the reporting requirement would ultimately be held not to cover the Vesco contribution. We deal below with the validity of that expectation. Appellant's acts also suggest a hope that the full circumstances of the gift would never be known, precluding any need for a legal ruling. If, as a matter of statutory construction, we should read in a *scienter* requirement to the extent necessary to shield a case such as this, the statute could be nullified by those affected at their pleasure. Appellant, viewed in the kindest light, was guilty of negligence of the kind suggested in the *Burroughs* case, *supra*. It knew the facts which it had a duty to report, and it knew of the law under which the duty arose. We need not attempt to marshal the decisions to decide just where the line should be drawn, since the case demands no fine discrimination to select a side of the line to place it on. The Appellant was guilty of the violations by its own stipulations and other evidence submitted by its counsel. In the circumstances, error, if error there was, in the trial judge's application of the *scienter* requirement, was harmless and not a proper basis for reversal.

Appellant urged that the Federal Election Campaign Act Amendments of 1974, 88 Stat. 1263, Pub.L. 93–443, and its legislative history reflect a Congressional understanding that under the 1971 Act *scienter* was a necessary element of any crime punishable by § 441. The parties submitted exhaustive supplemental briefs on this point. We find nothing in the material in conflict with our conclusions herein.

### III

█ Appellant also argues that its good faith reliance on counsel's advice is a defense to criminal conviction. But as Appellant itself admits at p. 9 of its motion, advice of counsel is not an absolute defense. Shale v. United States, 388 F.2d 616, 618 (5th Cir. 1968), cert. denied, 393 U.S. 984, 89 S.Ct. 456, 21 L.Ed.2d 445; United States v. Painter, 314 F.2d 939, 943 (4th Cir. 1963), cert. denied, 374 U.S. 831, 83 S.Ct. 1873, 10 L.Ed.2d 1054.

Further Appellant does not meet the two conditions for this defense that it sets out at p. 9 of its motion for acquittal: (a) full disclosure to counsel, and (b) unbiased and competent counsel. As noted above, other than Mr. Stans, Mr. Vesco, and Mr. Vesco's two agents, no one else knew of the full details of the transaction for which Appellant has been charged. The advice Mr. Stans received early in 1972 was not concerned with the exact situation that later arose. Mr. Stans later mistakenly regarded this case as analogous to the facts of another donation that Justice afterwards regarded as entirely different. Advice after the act is not relevant. The prosecution did not deny that Mr. Vesco orally promised the donation before April 7, and had the money ready. The legal sufficiency of this as a defense must now be considered.

### IV

Appellant's next challenge to the conviction is that the court should have adopted its position that the 1925 Corrupt Practices Act governed the transaction and that under the 1925 Act the contribution was completed at the time of the promise—and not at the time of the delivery, and thus was not reportable under the 1971 Act.

Appellant fails to explain how the 1925 Act, which was repealed on April 7, the effective date of the 1971 Act, would be legally operative on April 10, 1972, the date of the delivery. Conceding *arguendo* Appellant's position that the 1925 Act did require, if at all, the contribution to be treated as having occurred when promised, Appellant still loses the argument because this rule of law was not in effect when the April 10 events occurred.

Examination of the 1971 Act discloses that the same contribution could be reportable as much as THREE times: (1) when promised, under 2 U.S.C. § 431(e)(2) and § 434(b)(12), (2) when physically delivered, if over $100, under 2 U.S.C. § 431(e)(1) and § 434(b)(2), and (3) when transferred from one recipient Committee to another Committee under 2 U.S.C. § 431(e)(3). This was the applicable law on April 10, 1972. This was the law Appellant is charged with violating—not the 1925 Corrupt Practices Act.

Moreover, the Congress expressly provided in § 436(d) that the regulations of the "supervisory officer", the GAO, should require that contributions and promises to contribute should be reported in separate schedules. In determining aggregate amounts of contributions "amounts reported as provided in such regulations shall not be considered until actual payment is made". Presumably a payment and a promise to pay should not be added together to make a figure exceeding $100 and thus triggering a duty to report the donor's name.

The GAO on March 24, 1972, 37 Fed. Reg. 6165 and ff., published regulations under the new law, with reporting forms. § 16.4 of the regulation, 37 Fed. Reg. at 6166, tells how a Committee is to report debts, obligations, and promises prior to their realization as cash. Basically, by § 16.4(a) they are to be reported separately from actual contributions until actually paid, liquidated, or cancelled. The GAO prescribed use of a Schedule E for these, as against Schedule A for cash contributions. Under this scheme, a promise would reappear continuously on Schedule E's filed quarterly until payment, and then it would show on Schedule A. However, § 16.4(a) by its terms only applies to promises after April 7. By § 16.4(b) promises under $100 or not in writing need not be reported before payment. By § 16.4(c), "such * * * promises" in existence prior to April 7 "are not required to be itemized as to date incurred or name of creditor or debtor, but any total outstanding amount may be shown." Clear-

ly § 16.4(c) does not say anything about how a cash payment is to be reported. It deals with the promise while it remains a promise only. The reporting of cash contributions over $100 is prescribed elsewhere in the regulation § 14.2(b)(2). Also it should be noted that in § 14.-2(b)(12), debts and obligations are again dealt with separately. Candidates, as distinguished from committees, are excused from reporting such debts and obligations.

█ Thus the statutory scheme, as interpreted by the GAO, was separate reporting for oral or written promises of payment, and for subsequent payment in cash, on separate schedules. The parties herein, have asserted an ambiguity in § 16.4(c) but, if it exists, it is in respect to reporting an oral promise to pay over $100, outstanding on April 7, and not fulfilled on the required reporting date. That is not this case. Mr. Vesco had paid well before the first reporting date. No report on Schedule E was thus ever required, but instead Schedule A should have reflected Mr. Vesco's name and address and the amount of his gift. The GAO interpretation stated in the above regulations is thus in no conflict with its position in this case, that an obligation to report the cash payment did exist. We so hold.

## V

█ Appellant also urges here, as it did not do below, that the Federal Election Campaign Act of 1971 infringes the First Amendment by chilling the freedom of association of would-be contributors, who can contribute over $100 per candidate per year only at the cost of publicity that might be undesired.

No foundation in record or findings having been laid below, Appellant would have us hold the whole Title III structure unconstitutional, in gross and at large, without any factual showing that the legislation chills anyone, as actually applied to Appellant or any other group or person. In Pichler v. Jennings, 347 F.Supp. 1061 (S.D.N.Y.1972), District Judge Pollack held that a similarly un-

supported challenge to Title III by the Conservative Party of New York did not raise a serious enough Constitutional issue to justify convening a 3-judge court.

Appellant says the allowance of secrecy only to gifts of $100 and under would chill many campaign gifts and present no conceivable menace to the integrity of the electoral process, presumably those over $100 and under some other unknown figure. In the absence of data, we are in no position to make a merely speculative determination as to the degree of chill to be expected from publicity on donations of any particular amount, nor as to how large a gift is necessary to undermine the integrity of a candidate. The $100 figure is, it would appear, high enough for a political campaign to enjoy substantial financial support from secret gifts alone. Appellee says that 96% of all political contributors contribute $100 or less; that in 1972 Nixon got 900,000 and McGovern 700,000 such gifts.

The 1971 Act adds no new "chill" not already in the Corrupt Practices Act of 1925, which required political committees to report contributions of $100 or more. Indeed, to the extent that contributors naturally tend to "round out" to a $100 figure, the new law lessens whatever "chill" may be speculated to have previously existed. In the landmark cases wherein claims of unconstitutional chill have met judicial acceptance, the impact of the challenged action has plainly appeared on the record. NAACP v. Alabama, 357 U.S. 449, 462–463, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Dombrowski v. Pfister, 380 U.S. 479, 487–488, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). *See also* Laird v. Tatum, 408 U.S. 1, 13–14 n. 7, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). No such conclusion emerges here.

In California Bankers Ass'n v. Shultz, 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974), the Supreme Court dealt with statutory requirements for bank record keeping and reporting. The ACLU challenged the former under the First Amendment, saying they might be used to obtain the identities of its members and contributors. The Court answer was: "in the absence of a concrete fact situation in which competing associational and governmental interests can be weighed, [the Court] is simply not in a position to determine whether an effort to compel disclosure of such records would or would not be barred by cases such as NAACP v. Alabama, [357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)]." With respect to the reporting requirements, the Court observed that there was no allegation that the ACLU regularly engaged in the types of financial transactions that were subject to reporting. Therefore no concrete controversy was presented for adjudication. (416 U.S. at 56, 94 S.Ct. at 1515).

In light of this authority, the barren record in this case is not an appropriate medium for a challenge to the constitutionality of a statute whose general validity was established forty years ago in *Burroughs & Cannon, supra,* a decision cited with approval, as a pertinent comparison, in United States v. Harriss, 347 U.S. 612, 625, 74 S.Ct. 808, 98 L.Ed. 989 (1954). United Federation of Postal Clerks v. Blount, 325 F.Supp. 879, 886 (3-judge court, D.D.C.), aff'd, 404 U.S. 802, 92 S.Ct. 80, 30 L.Ed.2d 38 (1971), Judge J. Skelly Wright of this court, concurring, takes the view that an inferior court should leave to the Supreme Court the initiative in declaring a statute—in that case, the Federal employees anti-strike law—unconstitutional under the First Amendment, despite his own grave doubts, when it has been accepted and acted on as valid for a long time and legal attacks have failed, even in the absence of an on-point Supreme Court decision. He says: "If the right of public employees to strike—with all its political and social ramifications—is to be recognized and protected by the judiciary, it should be done by the Supreme Court which has the power to reject established jurisprudence and the authority to enforce a sweeping rule."

So here with the right of large donors to secrecy. The 1925 legislation was sustained in *Burroughs & Cannon.* The at-

tack was not on First Amendment grounds, but the compelling interest underlying the requirement of disclosure of substantial contributions to political committees was referred to in First Amendment context in *Harriss.*

The *Harriss* case upholds the validity of the Federal Regulation of Lobbying Act, 2 U.S.C. §§ 261–270, which requires publicity for money contributions for lobbying purposes. Lobbying is of course a pejorative term, but another name for it is petitioning for the redress of grievances. It is under the express protection of the First Amendment. In upholding the legislation as constitutional, Chief Justice Warren said, 347 U.S. at p. 625, 74 S.Ct. at p. 816:

> Toward that end, Congress has not sought to prohibit these pressures. It has merely provided for a modicum of information from those who for hire attempt to influence legislation or who collect or spend funds for that purpose. It wants only to know who is being hired, who is putting up the money, and how much. It acted in the same spirit and for a similar purpose in passing the Federal Corrupt Practices Act—to maintain the integrity of a basic governmental process. See Burroughs and Cannon v. United States, 290 U.S. 534, 545, [54 S.Ct. 287, 290, 78 L.Ed. 484.]

The dissents in *Harriss* would demand more narrowly drawn and precisely stated legislation, to avoid unconstitutional chilling of petitioning rights. They do not assert the topic is immune from statutory coverage. Chief Justice Warren addresses himself to the chilling contention, although without use of that particular word, 347 U.S. at p. 626, 74 S.Ct. at p. 816:

> It is suggested, however, that the Lobbying Act, with respect to persons other than those defined in § 307, may as a practical matter act as a deterrent to their exercise of First Amendment rights. Hypothetical borderline situations are conjured up in which such persons choose to remain silent because of fear of possible prosecution

for failure to comply with the Act. * * * The hazard of such restraint is too remote to require striking down a statute which on its face is otherwise plainly within the area of congressional power and is designed to safeguard a vital national interest.

In Attorney General v. Irish Northern Aid Committee, 346 F.Supp. 1384 (S.D.N. Y.), aff'd, 465 F.2d 1405 (2d Cir.), cert. denied, 409 U.S. 1080, 93 S.Ct. 679, 34 L.Ed.2d 669 (1972), the court was faced with a First Amendment argument very similar to the one at bar, directed against inspection of books and records which would disclose names and addresses of contributors. The Government's purpose was to enforce the Foreign Agent's Registration Act, 22 U.S.C. § 611. The court held that in view of the "strong Governmental interest supporting the disclosure sought" (p. 1390), cases such as NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), "and its progeny" were not applicable. Too much dependence cannot be put on the case here in view of the distinction existing in many minds between the application of the Bill of Rights to agents of foreign principals, and other persons; however, it supports the decision of the court below so far as one may regard the public interest there involved as comparably compelling. There is a strong dissent to the denial of certiorari, partly on First Amendment grounds, by Mr. Justice Marshall and two other justices.

Recent cases dealing with other parts of the Federal Election Campaign Act of 1971 are not in point. American Civil Liberties Union v. Jennings, 366 F.Supp. 1041 (3-judge court, D.D.C. (1973) ), addresses primarily Title I of the Act, with which we are not here concerned, and as to Title III, it declares that Title, properly construed, not to apply to the ACLU. *Accord:* United States v. National Committee For Impeachment, 469 F.2d 1135 (2d Cir. 1973).

We reject the attack on this statute on First Amendment grounds on the present record—in the context of *Bur-*

*roughs & Cannon* and *Harriss*, and in the absence of a foundation in fact, as contrasted with speculation.

Affirmed.