UNITED STATES of America

v.

HANKIN, Perch, Perch P. Hankin, Appellant.

No. 79–1675.

United States Court of Appeals, Third Circuit.

Argued Sept. 7, 1979.

Decided Oct. 10, 1979.

As Amended Nov. 15, 1979.

Theodore W. Flowers (argued), Thomas A. Allen, White & Williams, Philadelphia, Pa., for appellant.

Eric H. Holder, Jr. (argued), Craig C. Donsanto, Samuel M. Forstein, Dept. of Justice, Washington, D. C., for appellee.

Before ALDISERT, ROSENN, and GARTH, Circuit Judges.

### OPINION OF THE COURT

ROSENN, Circuit Judge.

This is an appeal by the defendant, Perch Hankin, from a judgment of the District Court for the Middle District of Pennsylvania finding him guilty of violating the Federal Election Campaign Act, 18 U.S.C. § 614 (1970 Supp. V).[1] The statute provided in pertinent part:

(a) No person shall make a contribution [to a candidate for federal office] in the name of another person . . . . .

(b) Any person who violates this section shall be fined not more than $25,000 or imprisoned not more than one year or both.

The defendant appeals principally on the grounds that the district court improperly applied a scienter standard and that the statute of limitations barred the prosecution.[2] Because we find that the Government has not met its burden of proof with respect to prosecution within the applicable three year statute of limitations, we reverse.

### I.

In February 1976 Hankin approached two of his friends, Harry Hilger and Dante Iacampo, and requested that they and their wives contribute $250 each to the Shapp for President Committee. (In order to qualify for federal matching funds the Shapp campaign had to raise $5,000 in twenty states in individual contributions that did not exceed $250.) Both Hilger and Iacampo complied with Hankin's request by writing two $250 checks each to the Shapp Committee. The four checks were dated February 4, 1976.

Hankin gave Hilger $500 on the day he requested the two $250 contributions. He gave Iacampo $500 a few days thereafter. The Government concedes that Hankin's last contact with the conduit contributors was probably before February 9, 1976. It is not clear precisely what day the Shapp Committee received the checks. Hilger testified that he mailed his two checks within a day or two of February 4 to "some address that had been supplied to [him]." Iacampo did not testify as to when or where he sent the contributions. The checks were deposited by the Committee on February 10, 1976. Some testimony indicated the checks may have been received by the Committee on the date of deposit. Other testimony indicated the checks may have been received by a Committee fundraiser prior to the date of deposit and forwarded to the Committee by February 10.

On February 9, 1979, a four count information was filed against Hankin, charging him with illegally making four campaign contributions in the names of Dante and Mary Iacampo and Harry and Lois Hilger. On May 9, 1979, a jury convicted Hankin on all four counts.

### II.

The statute of limitations under the Federal Election Campaign Act is three years. 2 U.S.C. § 455 (1976). The Government has the burden of proof that the prosecution was instituted within the applicable statute of limitations. *See, e. g., Grunewald v. United States,* 353 U.S. 391, 396, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957); *United*

---

1. 18 U.S.C. § 614 (1970 Supp. V) was repealed and reenacted in amended form effective May 11, 1976, subject to a savings provision, Pub.L. 94–283, § 114 (May 11, 1976). The savings provision maintained the vitality of the repealed act until the effective date of the recodification, 2 U.S.C. § 441f (1976).

2. Defendant also raises the issues of improper venue and the overbreadth of 18 U.S.C. § 614. In light of our conclusion that the statute of limitations bars this prosecution we find it unnecessary to reach these claims and the scienter issue.

*States v. Wolf*, 405 F.Supp. 731 (E.D.Mo. 1975), *aff'd* 535 F.2d 476 (8th Cir.), *cert. denied*, 429 U.S. 920, 97 S.Ct. 315, 50 L.Ed.2d 287 (1976). Because the Information was filed on February 9, 1979, the Government has the burden of proving that Hankin's criminal acts occurred after February 9, 1976.

### III.

This brings us to the key issue in this case, whether or not Hankin's criminal actions took place after February 9, 1976. The Supreme Court has held that statutes of limitations normally begin to run when the crime is complete. *Toussie v. United States*, 397 U.S. 112, 115, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970). The Government contends that Hankin's criminal act was not complete until February 10, 1976, when the Shapp Committee deposited the four $250 checks. Hankin's position is that the crime was complete before February 9, 1976, when the checks were mailed.

18 U.S.C. § 614 (1970 Supp. V) provides that it is a crime to "make a contribution" to a candidate for federal office "in the name of another person." The Government, under the rationale of *United States v. Chestnut*, 533 F.2d 40 (2d Cir. 1976), claims the contribution was not made by Hankin until the checks were deposited by the Shapp Campaign Committee. In *Chestnut* the defendant was convicted of causing another to accept and receive an illegal corporate campaign contribution in violation of 18 U.S.C. §§ 610 and 2. The defendant argued that venue was improper in the Southern District of New York because the offense, if any, consisted of causing the unlawful contribution in Minnesota rather than causing the receipt of the checks in New York. The court said "the substantive offense . . . is the receiving and accepting of an unlawful contribution" and concluded that venue was proper where the checks were deposited. 533 F.2d at 47.

The Government's reliance on *Chestnut* is misplaced. In *Chestnut* the crime was in causing another to *accept* and *receive* an illegal contribution. In this case the crime charged under section 614 of the Election Campaign Act is to "*make* a contribution in the name of another person." (Emphasis supplied.) It does not follow that because the crime of receiving and accepting contributions includes the act of depositing checks, the act of making contributions necessarily includes the same element. To the contrary, the existence of a separate crime for receiving and accepting illegal contributions and a different crime for making illegal contributions may indicate that Congress intended separate definitions for each crime.[3] In any event, the court's holding in *Chestnut* is not dispositive.

In reaching its decision in *Chestnut*, the Second Circuit articulated a test which is helpful in discerning the meaning of 18 U.S.C. § 614. The court said:

> In determining proper venue then, the district court must ascertain both the nature of the offense and the location of the acts constituting it. [Citations omitted.] One helpful technique has been to *study the key verbs* which define the criminal offense in the statute. [Emphasis supplied.] 533 F.2d at 46–47.

The key verb in 18 U.S.C. § 614 is "make." Thus, the issue is whether *making* a contribution occurs at the time of deposit of the checks or at some time before.

In *Clark v. Commissioner of Internal Revenue*, 253 F.2d 745 (3d Cir. 1958), this court dealt with the analogous question of whether a business expense was made for tax purposes if the checks remained outstanding. The court said:

> As a general proposition delivery of a check will establish the same right to a

---

3. 18 U.S.C. § 614(a) (1970 Supp. V) had separate clauses to prohibit the making and accepting of contributions in the name of another. It read:

§ 614. *Prohibition of contributions in name of another*

(a) No person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution, and no person shall knowingly accept a contribution made by one person in the name of another person.

deduction as would delivery of cash. It does not matter that the check was not cashed or deposited or the drawer's account charged until the following year. 253 F.2d at 748.

Similarly, in *Flint v. United States,* 237 F.Supp. 551 (D.Idaho 1964), the court dealt with the issue of when a payment of taxes was made. Relying primarily on this court's holding in *Clark,* the court concluded the taxes were paid upon delivery of the check and not deposit in the bank. *See also Estate of Witt v. Fahs,* 160 F.Supp. 521, 523 (S.D.Fla.1956).

Cases from other areas of the law also indicate that payment is made prior to the time of deposit of the check. *See e. g., Wayzata Enterprises, Inc. v. Herman,* 268 Minn. 117, 128 N.W.2d 156 (1964) (payment on real estate contract is deemed to be made as of delivery of check when check is subsequently paid in due course); *Ogier v. Pacific Oil and Gas Development Corp.,* 135 Cal.App.2d 776, 288 P.2d 101 (1955) (payment for securities was made as of delivery of check when check is subsequently paid in due course); *Fletcher v. Ray,* 220 Ark. 844, 250 S.W.2d 734 (1952) (candidate's election fee is paid as of delivery of check when check is subsequently paid in due course); *Finn v. National City Bank of New York,* 36 N.Y.S.2d 545 (N.Y. County 1942) (mailing of check by bank constitutes delivery so as to prevent attachment of debt in New York prior to presentment); *Texas Mutual Life Insurance Association v. Tolbert,* 134 Tex. 419, 136 S.W.2d 584 (1940) (insurance premium is paid as of delivery of check when check is subsequently paid in due course); *Franciscan Hotel Co. v. Albuquerque Hotel Co.,* 37 N.M. 456, 24 P.2d 718 (1933) (payment of taxes was made as of delivery of check).

In its definitions under the Federal Election Campaign Act, Congress may have in-

dicated that the act of making a contribution does not require a deposit of the checks. This conclusion is reached from 2 U.S.C. § 431(e)(2) (1976) which gives one of several definitions of a contribution as "a written contract, promise or agreement, whether or not legally enforceable, to make a contribution . . . ." [4] The use by Congress of the language "whether or not legally enforceable" along with "make a contribution" implies that the act of making the contribution is concluded regardless of the enforceability or revocability of the contribution.

The Government argues that Hankin did not make his contribution until the checks were deposited because the Committee could have rejected the gift. This argument fails for three reasons. First, in section 431(e)(2) Congress said the act of making the contribution does not require legal enforceability. The act of making the contribution was complete whether or not the Committee decided to deposit the checks. Second, the Committee could have rejected the contribution well after the date of deposit by returning another check. The date of deposit is merely an arbitrary date at which the Government contends the contribution was irrevocable. We believe the contribution was no more irrevocable on the date of deposit than on the date of mailing, the date of receipt, or two weeks after the date of deposit. Third, there is no evidence in the record to indicate that the person depositing the contributions had any authority to reject them.[5]

The Supreme Court in *Toussie v. United States,* 397 U.S. 112, 114–15, 90 S.Ct. 858, 860, 25 L.Ed.2d 156 (1970), set out several considerations which help us determine when the statute of limitations began to run in this case.

---

4. At the time that 18 U.S.C. § 614 (1970 Supp. V) was in effect, 2 U.S.C. § 431(e)(2) (Supp. V 1975) said "a contract, promise, or agreement, express or implied, whether or not legally enforceable, to make a contribution . . . ." This slight variation is not relevant to our analysis of the provision.

5. The Assistant Treasurer of the Shapp Committee testified that she could reject contributions if they were facially defective, such as a gift from a corporation. However, she did not testify that she had the right to accept or reject checks on a personal checking account.

The purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions. Such a limitation is designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past. Such a time limit may also have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity. For these reasons and others, we have stated before "the principle that criminal limitations statutes are 'to be liberally interpreted in favor of repose,' *United States v. Scharton,* 285 U.S. 518, 522 [52 S.Ct. 416, 417, 76 L.Ed. 917] (1932)."

The purpose of 18 U.S.C. § 614 is to punish the *making* of illegal contributions. As pointed out earlier, another provision punishes the receipt of illegal contributions. The criminal act of making the illegal contribution is complete before the deposit of the checks. It would run counter to the purposes of the statute of limitations to permit the Shapp Committee to determine the temporal limits of Hankin's prosecution based on when the Committee decided to deposit the checks. Such a result would afford the defendant no protection against possible prosecution long after his criminal acts are completed.

We hold that the statute of limitations began to run when the contributions were made which, in this instance, was prior to the day of the Committee's deposit. It is unnecessary for us to decide whether the crime was completed on the date of mailing or on the date of receipt by the Committee because the only act which the Government proved occurred after February 9, 1976, was the deposit of the checks. The Government contends in its brief that the checks were received on February 10, 1976, by the Committee. Its only evidence on this contention is that it was the practice of the Committee to deposit checks on the date of receipt. As

we read the record, it is not at all clear that the checks were received by the Committee on February 10. The Assistant Treasurer of the Shapp Committee testified on cross examination that the four checks may have been delivered to a Committee fundraiser prior to February 9. She had no recollection of the exact date the checks were received. Given the fact that the checks were drafted on February 4 and there was evidence of mailing promptly thereafter, we find it difficult to accept the Government's contention that the checks were received by the Committee on February 10, the day of deposit. Therefore, even if the statute of limitations began to run on the date of receipt, the Government has failed to meet its burden by proving receipt after February 9, 1976.

The statute "is to be liberally interpreted in favor of the accused." *Waters v. United States,* 328 F.2d 739, 742 (10th Cir. 1964). As the late Judge Fahy said in *Askins v. United States,* 102 U.S.App.D.C. 198, 201, 251 F.2d 909, 912 (1958), "society is likely to be healthier on the whole if an individual suspected of a noncapital offense is either charged within a specified time . . . or else is relieved of the never-ending possibility of public accountability for an accusation arising out of the long ago." The remedy for failure to bring an action within the statute of limitations is a bar to the right of prosecution. *Waters v. United States, supra,* 328 F.2d at 743; *Benes v. United States,* 276 F.2d 99, 108–09 (6th Cir. 1960); *Chaifetz v. United States,* 109 U.S.App.D.C. 349, 351–52, 288 F.2d 133, 135–36 (D.C. Cir. 1960), *rev'd on other grounds* 366 U.S. 209, 81 S.Ct. 1051, 6 L.Ed.2d 233 (1961).

Accordingly, the judgment of the district court will be reversed and the cause remanded with directions to vacate the judgment and dismiss the information.

GARTH, Circuit Judge, dissenting:

I dissent from the majority's holding that the prosecution in this case was barred by the Statute of Limitations. Because I

would hold that Hankin's violation of the Federal Campaign Act was completed when the Shapp Committee had accepted the tendered donations, I conclude that the prosecution in this case was brought within the statutory period.

## I.

Perch Hankin was convicted by a jury on four counts of making campaign contributions "in the name of another."[1] The information which ultimately led to Hankin's prosecution and conviction was filed in the Middle District of Pennsylvania on February 9, 1979. The applicable Statute of Limitations is three years. 2 U.S.C. § 455 (1976).

The evidence, as regards the Statute of Limitations issue, is uncontroverted. In early February, 1976, Hankin solicited four contributions of $250, each to be made to the Shapp for President Committee.[2] Two of these contributions were made by Mr. and Mrs. Harry Hilger; Mr. Hilger was an employee of the bank of which Hankin was president. The other two contributions came from Mr. and Mrs. Dante Iacampo; Mr. Iacampo was a long-time friend and associate of Hankin's. All four contributions were made by checks payable to the Shapp Committee and drawn on February 4, 1976. Mr. Hilger testified that he mailed his checks directly to Shapp headquarters at an address supplied by Hankin. App. at 88a. Mr. Iacampo indicated that he gave his checks directly to Hankin. App. at 107a. The records of the Shapp Committee, which were introduced at trial, reveal that the Committee deposited these checks in its Harrisburg bank account on February 10, 1976. There was also testimony at trial that the practice of the Shapp Committee was to deposit accepted contributions[3] on the date of receipt. Mrs. Sandra Rainer, the assistant treasurer of the Shapp Committee testified as follows:

Q  Can you tell when those contributions—the four contributions that are represented by government exhibits 7 through 10 [the Hilger and Iacampo checks]—when those were actually received by the Shapp Committee?

A  Can I actually tell that?

Q  Yes.

A  They would be received February 10, 1976.

App. at 129a; *see also* App. at 137a. The government does not dispute the fact, however, that Hankin's payments reimbursing Hilger and Iacampo occurred before February 9, 1976.[4] Therefore, it is uncontrovert-

---

1. Federal Election Campaign Act Amendments of 1974, Pub.L.93–443, 88 Stat. 1264 (formerly codified at 18 U.S.C. § 614). In relevant part this statute provided:

   § 614. Prohibition of contributions in name of another

   (a) No person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution, and no person shall knowingly accept a contribution made by one person in the name of another person.

   This section was repealed effective May 11, 1976. Pub.L.94–283, § 201. It is applicable to this prosecution, however, because of a savings clause. *Id.* at § 114.

   The new provision is set out at 2 U.S.C. § 441f (1976).

2. Although Hankin expressed ignorance of this fact, *see* App. at 168a, in order to qualify for matching funds under the Presidential Primary Matching Funds Act, 26 U.S.C. § 9033 (1976), presidential candidates are required to raise $5,000 in each of 20 states through individual contributions not exceeding $250.

3. Many attempted contributions could not legally be accepted. The Federal Election Campaign Act, 2 U.S.C. 431 *et seq.*, prohibits, for example, contributions from individuals in excess of $1,000. *Id.* at § 441a. *See also* p. 614 *supra.*

4. Critical to Hankin's prosecution were the undisputed facts that he reimbursed the Hilgers and Iacampos for the total amounts of their checks. These facts created the inference that Hankin had, in actuality, made the contributions himself, "in the name of another," merely using the Hilgers and Iacampos as conduits for his own gift. Mr. Hilger was actually "reimbursed" before he had executed his check. App. at 87a. The timing of Mr. Iacampo's reimbursement is less clear. The solicitations were made in a plane en route to Las Vegas; the reimbursements were apparently made during that trip. App. at 106a. As stated in text, the government offered no proof, and did not attempt to argue, that Mr. Iacampo was reimbursed after February 9, 1976.

ed that the only events which took place within the statutory period were the receipt, acceptance and deposit of the four checks by the Shapp Committee.

## II.

In concluding that this prosecution was time barred, the majority holds that "the statute of limitations began to run when the contributions were made." Maj. Op. at 615. The majority then states that "It is unnecessary for us to decide whether the crime was completed on the date of mailing or on the date of receipt by the Committee because the only act which the Government proved occurred after February 9, 1976, was the deposit of the checks." *Id.* But since Mrs. Rainer's testimony is unequivocal that receipt occurred on February 10, 1976, a fair reading of the majority opinion must be that a contribution is deemed "made" when it is mailed (*see* note 8 *infra*). We recognize, however, that the expressed holding of the majority opinion is that something less than deposit of the contribution by the recipient completes the crime.

As I analyze the problem, there are at least four events from which the Statute of Limitations can be measured in a prosecution under § 614. The first, and the one which the majority opinion would seemingly opt for, is the *mailing* of the check or the hand delivery of the contribution. The second is the *receipt* of the contribution by the Committee. Third is the *acceptance* of the contribution by the donee. And last is the *deposit* of the contribution in the Committee's bank account. The majority opinion, while ostensibly not deciding which of the first three events "triggers" the Statute of Limitations, is nevertheless firm in rejecting the "deposit" of the contribution as the determinative event. I suggest, however, that in so holding the majority opinion has given insufficient consideration to the concept of "acceptance," as proved in this case by the deposit of the checks. I would hold that acceptance is the only logical event by which to measure the Limitation statute.

## III.

The term "contribution" as it appeared in § 614, and even as it appears today in the successor statute to § 614 (2 U.S.C. § 441f), was then, and is now, defined as "a *gift* . . . made for the purpose of influencing the nomination for election, or election, of any person to Federal office . . ." 88 Stat. 1260 (emphasis added); 2 U.S.C. § 431(e). Absent any indication to the contrary, and none appears here, it seems clear to me that this definition invokes established principles of gift law. Foremost among these principles is the rule that a gift does not become effective until it is delivered to and accepted by the intended donee. *See, e. g., Lewis v. United States,* 338 F.2d 114, 116, 168 Ct.Cl. 208 (1964); *Malone v. United States,* 326 F.Supp. 106, 110 (N.D.Miss.1971) *aff'd* 455 F.2d 502 (5th Cir. 1972); *Estate of Chiara,* 467 Pa. 586, 359 A.2d 756, 759 (1976); *Estate of Goebel,* 295 N.Y. 73, 65 N.E.2d 174 (1946). It is also well settled that a gift made by check does not become effective until the check is accepted by the bank on which the check was drawn. *See In re Brown's Estate,* 159 Kan. 408, 155 P.2d 455 (1945); *see also* Bruton, *The Requirement of Delivery as Applied to Gifts of Choses in Action,* 39 *Yale L.J.* 837, 843 (1930).

The reason for these rules is evident: because a gift by its very nature does not require consideration a donor is free to revoke his gift at any time before it is accepted by his donee. And, because he has promised no performance or other consideration in return, a donee is under no obligation to accept the proffered gift. The requirement of acceptance, which is traditional in and embodied in gift law, has a particular significance in the election law and campaign areas. Because of the extremely technical nature of the rules governing campaign contributions, acceptance of the donation is not routine and thus may not automatically occur. Moreover, donors to election campaigns, for many reasons, may be required to revoke their tendered contributions. Indeed, as I later discuss, *see* p. 614, *supra,* in this very case, the evidence discloses that campaign committees must often reject contributions which they receive.

By contrast, analogizing to contract law in this "contribution/gift" context, as the majority has attempted to do, sheds little light on the question of when a § 614 crime is completed. The law of contracts, as it applies to the making of a contract, varies not only from jurisdiction to jurisdiction, but it also varies according to the nature of the parties' agreement. Each state is free to enact its own rules of contract law, and within that framework, parties to a contract can provide different modes and times for binding themselves, for making payments and the like, i. e.—on mailing a signed copy, on receipt of a signed copy, etc. The Uniform Commercial Code recognizes, and neither prevents nor excludes, these types of arrangements.

For still other reasons, the majority's reliance on tax law is similarly misplaced. The majority opinion seeks support for its holding by analogizing to the tax law. It points to the fact that cash basis taxpayers may deduct, in a current taxable year, charitable contributions upon delivery (i. e., mailing of their checks) even though the checks may not be deposited or cashed by the donee until the following tax year. I do not find analogies to the tax law to be particularly helpful in the present context. First, the tax law is in large part an area unto itself and cannot readily be extended to other statutory or legal contexts. Second, the tax rule to which the majority has adverted may have its justification in reasons of administrative convenience: the taxpayer is primarily responsible for reporting his income, and it would be unduly burdensome if taxpayers seeking charitable deductions in a particular tax year were forced to keep track of whether their gifts had been accepted at all, let alone within that tax year. By contrast, all records of political contributions must be kept by the campaign headquarters; the individual contributor is not required to follow-up on his donation. Finally, the effect of the tax rule is to benefit taxpayers by enabling them to take earlier deductions. When this rule is transferred to the election context, however, a donor may be severely disadvantaged. If an illegal contribution is considered to be "made" when the donor puts his check in the mail, or at any other time prior to acceptance, the donor runs the risk that although he may subsequently revoke his gift, as he has a legal right to do, or have it rejected, he may nevertheless incur criminal liability even though, in simple fact, no money or thing of value has ever changed hands. Yet, the majority, by fixing his liability at a time prior to the donee's acceptance, would nonetheless hold him in violation of § 614.

Hence I am satisfied that if we are to seek assistance in interpreting § 614 from any other body of law, we should focus not on concepts of contract law, which are ambiguous, or on tax law, which is *sui generis*, but rather on gift law which is the very area implicated by the statute. The evidence in this case bears out the importance of invoking the acceptance requirement of gift law. The treasurer of the Shapp campaign, Mr. G. Thomas Miller, testified that the Committee frequently was obliged to return contributions for a variety of reasons:

> The most common was that we could not completely and positively identify the contributor. There was of course a mandate that there be no corporate contributions. Sometimes when an individual contributed in the name of his sole business proprietorship which was appropriate, it still sounded like a corporation, we would have to get that clarified. There would be other problems with the address of the contributor or sometimes a married woman would contribute in her husband's name, we needed her first name, things of that sort.

> They were always either returned or held if they were checks, held uncashed until we could get a clarification or if the contribution was clearly wrong, it was simply returned. And we would go back to the contributor through the solicitor, if a solicitor were involved, or if it were a direct contribution we would go back to the contributor by mail or telephone to make that clarification.

App. at 72a. Mrs. Rainer, assistant treasurer, testified:

[T]here were checks that we would receive that we could not deposit because we didn't know if they were corporate checks or not. So we therefore would have to check if it appeared to be a corporate contribution, we had to either write or first of all make a phone call or write and get proof, written proof, that this was not a corporate check. In that case, the check would not have been deposited that day. But if a check came in from individuals, with signatures signed on an individual check on a personal checking account, then they could be deposited.

App. at 136a–137a. In each of the instances recited, where contributions were returned *without having been accepted*, as I understand the majority's approach, criminal liability would nevertheless attach to the donor (if his contribution was illegal)—and even though the donation was rejected by the Committee. I cannot endorse an interpretation of § 614 which necessarily leads to such impractical and illogical results.

I agree with the majority opinion which concludes that *United States v. Chestnut*, 533 F.2d 40 (2d Cir. 1976), is not dispositive of our issue. But it cannot be denied that *Chestnut* bears heavily upon this case and supports the "acceptance" position which I advance in this dissent. *Chestnut*, in no respect, can be read as leading to the conclusion that a contribution within the meaning of § 614 may be "made" before it has been "accepted." In *Chestnut* the Second Circuit was faced with a venue challenge to a prosecution for receiving illegal campaign contributions. The prosecution was brought in the Southern District of New York. The contribution involved came about in the following fashion. A Minnesota farmers' cooperative organization paid a debt on behalf of the Humphrey senatorial campaign. The debt was owed to a New York advertising agency. The defendant in the case was the Humphrey campaign manager who had orchestrated the illegal payment from his Minnesota office. The payment itself had been made in Minnesota. The only activity which occurred in New York was the deposit of the check in the advertising firm's bank account.[5] Nonetheless, the Second Circuit upheld venue in the Southern District: "the deposit of the checks in New York, where the principal offices and officers of L & N [advertising agency] were located, constituted the ultimate essential element of the offense of accepting and receiving an unlawful contribution." 533 F.2d at 47. The majority opinion here correctly points out that in focusing on the question of where the crime occurred, the *Chestnut* court examined the "key verbs which define the criminal offense in the statute." *Id.* But the majority opinion apparently overlooks the second prong of the *Chestnut* test: "[t]he Court must next decide 'when the defendant's actions have progressed to the point where a court can confidently conclude that a crime has been committed.'" *Id.*

In *Chestnut,* an analysis of the key verbs might have placed venue in Minnesota where the Humphrey Committee was located, where the transaction was arranged, from where the checks were delivered and where they might have been received. But the court was not convinced that a crime had been committed until it could be satisfied that the contribution had been accepted: "[u]ntil the checks were deposited, the campaign debt was not discharged and no unlawful contribution had been received." *Id.* at 48. Prior to that time, the payment could have been revoked or the contribution rejected, thereby avoiding criminal liability. Thus, *Chestnut* stands for the proposition that, for the purposes of establishing criminal liability, a campaign contribution, regardless of when it is physically delivered and regardless of when it is physically received, only comes into being when it is unequivocally accepted. Thus *Chestnut* is consistent with, and buttresses, my own view that acceptance marks the completion of the crime with the fact and the date of

---

5. There is some ambiguity as to whether the advertising firm actually took possession of the checks in New York or Minnesota. 533 F.2d at 48.

deposit evidencing proof of acceptance.[6] For here, just as in *Chestnut*, the date of acceptance and the date of deposit coincided. Here, both events occurred on February 10, 1976.

## IV.

In this case, the evidence is conclusive that the contributions were not accepted until after February 9, 1976. Both the Shapp Committee records and the checks themselves reveal that they were deposited on February 10, 1976, thus indicating proof of acceptance on that date.[7] The uncontroverted testimony of the assistant treasurer of the Shapp Campaign was that accepted checks were deposited on the day of receipt. *See* p. 612 *supra.* Therefore, the record establishes the date of acceptance was February 10, 1979. The information was filed on February 9, 1979. Thus, the illegal contributions measured from the date of acceptance, were made within the three year period prescribed by the Statute of Limitations.[8]

## V.

I make no mention of the other issues raised by Hankin on appeal. Since the ma-

---

6. *United States v. Finance Committee to Re-elect the President*, 165 U.S.App.D.C. 371, 507 F.2d 1194 (D.C. Cir. 1974), also supports this position. In that case the court rejected the contention that the Federal Election Campaign Act of 1971, 2 U.S.C. § 431, did not apply to a contribution which had been promised prior to the effective date of the Act, but paid and received subsequent thereto. 165 U.S.App.D.C. at 375–76, 507 F.2d at 1198–99.

This construction, *i.e.,* that a contribution is "made" only when it is "accepted", among other things avoids still another anomalous circumstance which could result from the majority's construction of § 614. If I am correct in my understanding of the majority's position, it necessarily results in a situation where the crime of making a contribution (*i.e.,* mailing, or delivery, but in any event, something short of acceptance), would almost always be completed at a different point in time than the crime of accepting a contribution. I can think of no other situation involving interrelated crimes where this result occurs. Moreover, it is exceedingly doubtful that Congress ever intended such an incongruous result.

7. I can appreciate the majority's concern that by hinging the Limitation statute's running on *deposit* of the checks by the Shapp Committee, a defendant's criminal liability may be arbitrarily extended. But I emphasize that it is the acceptance and not the *deposit* (which is no more than proof of acceptance) which causes the statute to run. Once there is a valid acceptance, a defendant's criminal liability attaches no matter when, and whether or not, the political committee actually deposits the checks.

The New York Court of Appeals' decision in *Estate of Goebel, supra,* supports the view that it is acceptance, and not deposit, which completes a gift made by check. In *Goebel* the donor died before the check was properly deposited in the donee's bank. Nonetheless, the court held that the formality of deposit should not render the gift incomplete and voidable by the donor's estate. The gift was found to be complete, despite the donor's death, because the checks had previously been accepted on the donee's behalf.

8. Although the majority does not address the venue issue, it is controlled by the majority's treatment of the Statute of Limitations issue. For the majority to hold that the crime was barred by the Statute, it must hold that the crime was completed before February 9, 1976. The evidence is unequivocal, however, that the checks were received, accepted and deposited, all on the same day—February 10, 1976. Therefore, it is implicit in the majority holding that a crime under § 614 is completed at an earlier event—the mailing of the checks. Accordingly, venue in this case was improper, under the majority view, because the mailing occurred outside of the Middle District of Pennsylvania. In my analysis, however, the contribution was not "made" until it was accepted by the Shapp Committee. Consequently the critical element of the crime occurred in the Middle District of Pennsylvania and venue in that district was appropriate.

It should be noted that although § 614 has been repealed, the definition of "contribution" applicable in this case was maintained in the successor statute. 2 U.S.C. § 441f. Thus, the construction of § 614 adopted here by the majority will have continued precedential value. As regards the venue issue, in particular, this is especially unfortunate. For the majority holding creates yet another anomalous result. The logical extension of the majority's analysis would place venue at the home district of every potential donor. With such "fragmented" venue, enforcement efforts would undoubtedly be dispersed and diffuse. Hence, the result reached under the majority's logic would impute to Congress an intent to weaken, rather than strengthen, the election laws by rendering them exceedingly onerous, if not virtually impossible, to enforce.

jority has declined to address these claims, _see_ Maj. Op. at 612 n.2, it would similarly be inappropriate for me to do so. But, because I feel that it is more logical to adopt an "acceptance" cutoff date, which comports with both the statutory language and meaning, to say nothing of the Congressional intent, and because I find the conclusion inescapable that acceptance occurred, and was proved, within the statutory period, I must respectfully dissent from the majority holding.