**UNITED STATES of America, Appellee,**

v.

**Christopher PASSODELIS, Appellant.**

**No. 79–1486.**

United States Court of Appeals,
Third Circuit.

May 7, 1980.

Before SEITZ, Chief Judge, and ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS, GARTH, HIGGINBOTHAM and SLOVITER, Circuit Judges.

JAMES HUNTER, III, Circuit Judge.

The petition for rehearing filed by Appellee in the above entitled case having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active ser-

vice not having voted for rehearing by the court in banc, the petition for rehearing is denied.

GARTH, Circuit Judge, with whom ADAMS, Circuit Judge, joins, dissenting from Order denying Petition for Rehearing.

I vote to grant the government's petition for rehearing *en banc.* My recent dissent in *United States v. Perch Hankin,* 607 F.2d 611, 615 (3d Cir. 1979), which focussed not on venue considerations, but on *when* (and therefore *where*) a campaign contribution is made, anticipated the very question which I believe the panel majority in *Passodelis* has now answered incorrectly. The importance of properly resolving this issue cannot be minimized. This question not only concerns the operations of a relatively new statute, the Federal Election Campaign Act, but the answer which this court now has given to that question cannot help but have a devastating impact on the electoral process in an election year—which this is. Thus, I dissent from the court's order which has denied the government's petition for rehearing.

As I stated in my *Hankin* dissent, I believe that a proper interpretation of the Federal Election Campaign Act, requires us to hold that a contribution is "made" when it is "accepted" by the campaign committee. The panel majority, without analysis of where Passodelis' campaign contributions were accepted by the Shapp Committee, concludes that venue in the Middle District of Pennsylvania was improper because there is insufficient evidence that Passodelis "made" or that the Shapp Committee "received" the gifts in that district. Not only is its result flawed, but by ignoring the

concept of "acceptance," the opinion of the panel majority—which now becomes the law of this Circuit—seriously dilutes the vitality of the election laws. Further, I do not believe that the panel majority's interpretation of the Federal Election Campaign Act comports with the intent of Congress in passing that Act.

I.

Christopher Passodelis, the defendant-appellant, was convicted by a jury in the Middle District of Pennsylvania on one count of making contributions in excess of $1,000 to a candidate for federal office in violation of 18 U.S.C. § 608(b)(1) (Supp. IV 1974) and on eighteen counts of making contributions "in the name of another" in violation of 18 U.S.C. § 614 (Supp. IV 1974).[1]

At trial, the evidence showed that Passodelis, who was an enthusiastic supporter of Governor Shapp's 1976 presidential campaign, solicited $250 contributions from eighteen individuals who resided in four states—Michigan, Georgia, North Carolina and Delaware.[2] Passodelis then flew to each of those states and collected the contributions. At each of his stops, Passodelis reimbursed each of the contributors fully in cash. After the contribution checks were thus "collected" by Passodelis, he returned with them to his home in Pittsburgh.

There is some confusion as to how the contribution checks were transported from Pittsburgh to the Shapp Committee headquarters in Harrisburg. The panel majority summarized the evidence as follows:

"[t]he only testimony in the case concerning the transmittal of the checks by the defendant to the Shapp for President

---

1. These sections were repealed effective May 11, 1976, Federal Election Campaign Act Amendments of 1976, Pub.L.No.94–283, § 201, 90 Stat. 496, and reenacted in amended form. *See id.* § 112, 90 Stat. 486, 494 (codified at 2 U.S.C. § 441a(a)(1)(A) and 441f (1976)). They are applicable in this prosecution, however, because of a savings clause. Pub.L.No.94–283, § 114, 90 Stat. 495.

2. In order to qualify for matching funds under the Presidential Primary Matching Funds Act, 26 U.S.C. § 9033 (1976), presidential candidates are required to raise $5,000 in each of 20 states through individual contributions not exceeding $250.

Committee in Harrisburg, Pennsylvania [the Middle District] came from Patrick Kelly, an FBI agent who had interviewed the defendant prior to trial and who testified to admissions made by the defendant to him." Brief for Appellant at 22. When questioned as to what Passodelis told him that he did with the checks after collecting them, Kelly replied:

He couldn't recall specifically. He advised us that upon return to Pittsburgh [the Western District] he either personally hand carried the checks to Harrisburg, Pennsylvania, [the Middle District] or provided them to Mr. Seymore Heyison for transmittal to the Shapp for President Committee here in Harrisburg. But he could not remember exactly what he did with the checks.

App. at 58a, Record at 28.

Maj.Op. 615 F.2d at 978.

Because there was no definitive evidence as to whether or not Heyison was an agent of Passodelis, the panel majority concluded that the evidence of whether Passodelis "made" the contribution to the Shapp campaign in Harrisburg, or whether it was "received" in that city, was equivocal. Consequently, the panel majority concluded that the prosecution had not met its burden of establishing venue in the Middle District of Pennsylvania.

The panel majority at no time considered the question of where the contributions were *accepted*. If it had, it could not have avoided the conclusion that the contributions were accepted in Harrisburg. Sandra Rainer, the Assistant Treasurer of the Shapp Committee, who was in charge of maintaining financial records, testified that all of the checks came to her office in Harrisburg in a "large envelope." Mrs. Rainer stated the checks were not accompanied by all the information necessary to process the contributions. She then made inquiries in order to obtain that information before the checks were actually accepted and deposited in the Committee's bank account. *See* Petition for Rehearing at 7–8.

Mrs. Rainer's testimony is uncontroverted and, in fact, Passodelis' brief concedes the point: "We do not here dispute that the checks arrived at the Harrisburg Headquarters of the Shapp for President Committee or that they were duly processed there." Brief for Appellant at 22 *quoted in* Petition for Rehearing at 8. Therefore, had the panel majority accepted the concept that a campaign contribution is not "made" until it is accepted by the intended donee, the venue in this case, having been set in the Middle District of Pennsylvania, would have clearly been correct.

## II.

As I explained in my *Hankin* dissent, the definition of "contribution," as it appeared in §§ 608 and 614, under which Hankin was prosecuted, and as it currently appears in the successor statutes, 2 U.S.C. §§ 441a(a)(1)(A) and 441f (1976), invokes settled principles of gift law. A "contribution," for the purposes of the federal election laws, was then, and is now, defined as "a *gift* . . . made for the purpose of influencing the nomination for election, or election, of any person to Federal office . . . ." 88 Stat. 1260 (emphasis added); 2 U.S.C. § 431(e) (1976). Applying principles of gift law, it is apparent that a campaign contribution, like an ordinary gift, does not become effective until it is delivered to and accepted by the intended donee. *See United States v. Hankin*, 607 F.2d at 617. (Garth, J. dissenting).

Moreover, the traditional requirement of acceptance, which is embodied in gift law, has great practical significance in the areas of election law and campaign regulation. Because of the extremely technical nature of the rules governing campaign contributions, acceptance of donations is not routine and does not automatically occur. Indeed, in this very case, Mrs. Rainer did not accept the tendered donations until after she had conducted an investigation and was satisfied with the information she obtained, which was required by law, but which did

not accompany the checks. Thus, many proffered campaign gifts are not accepted and, as a corollary, in many instances donors may be required to, or may voluntarily, withdraw their tendered contributions. Yet, if a contribution can be "made," *before* it has been "accepted," as *Passodelis* holds, donors who withdraw their contributions could be faced with criminal liability—even though their tendered contributions were revoked prior to acceptance by the Campaign committee. Indeed, contributors would suffer criminal liability even where their contributions were rejected and returned by the intended donee. To me, this is an unacceptable, illogical result.

Furthermore, I have grave doubts that the harsh result which flows from the panel majority's analysis was intended by Congress. Congress has imposed criminal penalties upon illegal campaign contributions in an attempt to prevent undue influence from being exerted upon the election system. This end is not served by imposing criminal liability on putative campaign contributors *before* the prospect of undue influence is realized. Only when a contribution is indeed accepted, does the potential for undue influence upon the donee become real. Thus, criminal liability should be reserved for those situations where potentially illegal donations are in fact accepted, and the reach of such liability should not be extended to include situations where contributions are "made," possibly by mistake or ignorance, but never accepted.

Finally, particularly as it respects the question of venue, the construction of the statute adopted by the majority—under which a campaign contribution can be irrevocably "made" before it is "accepted"—portends dire consequences for the enforcement of the election laws. These problems, which could not have been intended by the Congress which drafted the statute, were anticipated in my *Hankin* dissent:

> It should be noted that although § 614 has been repealed, the definition of "contribution" applicable in this case was maintained in the successor statute. 2 U.S.C. § 441f. Thus, the construction of § 614 adopted here by the [Hankin] majority will have continued precedential value. As regards the venue issue, in particular, this is especially unfortunate. For the majority holding creates yet another anomalous result. The logical extension of the majority's analysis would place venue at the home district of every potential donor. With such "fragmented" venue, enforcement efforts would undoubtedly be dispersed and diffuse. Hence, the result reached under the majority's logic would impute to Congress an intent to weaken, rather than strengthen, the election laws by rendering them exceedingly onerous, if not virtually impossible, to enforce.

607 F.2d at 620 n.8. Thus, just as the limitations problem in *Hankin* has been complicated by the *Hankin* majority's adherence to the concept that liability attaches before a contribution is accepted, so too here, this same construction of the election law must inevitably have an adverse impact upon prosecutions brought under the Federal Election Campaign Act as they implicate venue.

### III.

This is a case where, under my view as to the proper construction of the Act, venue in the Middle District of Pennsylvania would clearly have been established. The government's Petition for Rehearing, which followed the filing of the panel opinion, reinforces my views as to the correct result in this case and as to the correct approach for determining when a campaign contribution is "made" (*i. e.*, accepted) for the purposes of the election laws. Furthermore, as I have stated in the introduction to this dissent, because the questions raised in interpreting the Federal Election Campaign Act have such enormous practical consequences in the enforcement of election laws, particularly in an election year, I believe that this case deserves *en banc* consideration by the

court. Consequently, I vote to grant the government's Petition for Rehearing and I dissent from this court's order which denies it.

\* \* \* \* \* \*

For the reasons set forth in his dissent, as well as for the reasons articulated by Judge Garth, Judge Adams also votes for rehearing. He shares Judge Garth's concern that under the interpretation of the Act adopted by the majority here and by the majority in *Hankin*, the effective enforcement of this important piece of legislation has been seriously impaired.